SIXTH DIVISION

July 31, 1998 

Nos. 1-97-4175 & 1-97-4445 Consolidated

ENRICA CIANCI, ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, ) Cook County.

)

v. ) No. 95 CH 7732

)

PETTIBONE CORPORATION, Beardsley ) The Honorable

Piper Division, JAMES HALL, and ) Sophia H. Hall,

MARY MENDEZ, ) Judge Presiding.

) 

Defendants-Appellees. ) 

---------------------------------------)-----------------------RENATE NOWOSAD, ) 

) 

Plaintiff-Appellant, ) 

)

v. ) No. 95 CH 7657

)

PETTIBONE CORPORATION, Beardsley ) The Honorable

Piper Division, JAMES HALL, and ) Michael Kelly,

MARY MENDEZ, ) Judge Presiding.

) 

Defendants-Appellees. ) 

JUSTICE GREIMAN delivered the opinion of the court:

Plaintiffs, Enrica Cianci and Renate Nowosad, brought suits against defendants Pettibone Corporation, Beardsley Piper Division (Pettibone), James Hall, and Mary Mendez alleging defamation.  The circuit court granted defendants' motion for summary judgment on Cianci's claim and, after trial, the circuit court entered judgment for defendants on Nowosad's claim.  Both plaintiffs appealed and this court consolidated the cases.  For the reasons that follow, we affirm.

On September 6, 1996, Cianci filed a second amended complaint alleging defamation.
(footnote: 1)  According to the complaint, Cianci was employed by Pettibone with Hall as her supervisor and Mendez as a member of management.  Cianci alleged that on April 15, 1994, Hall falsely stated in the presence of others that Cianci wrongfully made personal shipments via DHL courier services at Pettibone, charged the services to the company without permission from anyone in authority, did so secretly, and personally profited from the shipments.

Cianci further alleged that on April 19, 1994, Hall published a letter making "allegations of illegal DHL use by [Cianci]" and terminating her employment.  Cianci alleged that the statements in the letter and those made by Hall were published to nonmanagement employees of Pettibone, including but not limited to John Dreier.  Cianci alleged that Hall knew that the statements were false because it was "a fringe benefit of [Cianci's] employment with Pettibone" and her "use of DHL gratis had been approved by Pettibone management."

Cianci also alleged that Mendez falsely testified before an unemployment compensation hearing officer in regard to Cianci's claim for benefits, stating that Cianci had been fired for "taking company money via personal use of DHL at company expense."  Cianci claimed Mendez was aware of other employees using DHL for personal letters at the company's expense and Mendez herself used DHL for personal letters at the company's expense.  She also claimed that Mendez was aware of and approved her use of DHL for personal letters.

In her deposition, Cianci stated that she worked as an executive secretary for Pettibone and in 1991 she began assuming customer service duties.  On April 15, 1994, Tony Odarczenko, her supervisor in the customer service department, asked her to report to the conference room.  Hall, Mendez, Renate Nowosad (a coworker), and another member of the Pettibone staff were already in the room.  Hall had a list of DHL shipments sent from the company which he presented to Cianci and Nowosad.  He stated that Nowosad and Cianci were going to be suspended for three days because they used the DHL courier service without reimbursing the company.  It would later be determined whether they were still employed or terminated.  Nowosad stated that she "didn't do it," but no one else in the room said anything.  Cianci later received a letter terminating her employment.

Cianci reviewed the list of DHL shipments that had been given to her during the meeting and admitted using the DHL courier service to send various personal items without reimbursing Pettibone for the charges.  She admitted using the service to send her mortgage and credit card payments and to send a personal check order.  She further admitted using DHL service to send documents to her nephew in Italy.  She stated that the shipment to Italy included company equipment brochures.

Cianci identified Hall's letter terminating her employment, which stated, in part:

"In the meeting held on April 15, 1994, the issue of unauthorized personal use of the DHL courier service was discussed.  This activity was discovered by an audit of the DHL account where a number of unsigned DHL shipping documents were discovered and subsequently traced to employees.

At least 15 unauthorized DHL shipments went to places where you conduct personal business.  Specifically, several mortgage companies where you have or used to have accounts apparently received your mortgage payments via DHL.  Another recipient was a company that prints personal checks.  The 'ship to' address for the checks was your home address.

Unauthorized use of courier services is a serious problem.  We suspended your employment for three days to consider further action.  Upon further review of this situation we have decided to terminate your employment.  Your last day of official employment will be April 20, 1994.  We regret having to take  this action but feel it is in the best long term interest of Beardsley and Piper."

Cianci admitted that she did not know if Hall had showed the letter to anyone else.  She stated that she knew that two female employees called Nowosad after the suspension and indicated that they knew the reason for the suspension and ultimately the termination, but Cianci did not know who told them.  John Dreier, another Pettibone employee, called her the day after she was terminated and indicated that he knew the reason for the termination, but Cianci did not know who told him.  In his deposition, Dreier stated that he had never seen the letter and he did not know whether Hall had showed the letter to anyone.

Cianci claimed it was a common practice for employees to use the DHL service and named several other employees who used DHL for personal business.  She knew of two employees who used DHL for personal business because they told her, she knew of another employee who used DHL for personal matters because his secretary told her and she knew of another employee who used DHL for personal business because she prepared the slips for him as his secretary.  She also stated that she knew that Mendez used DHL for personal business because she saw a copy of a DHL ticket on which she recognized Mendez's handwriting, and the shipment was to Sicily and Mendez had mentioned that her neighbor was from Sicily.  Cianci stated that she did not know whether anyone from Pettibone had authorized any of these individuals' use of the service for personal business and none of the individuals had told her that they were so authorized.  Cianci stated that she knew these individuals did not reimburse the company because John Dreier told her they did not reimburse the company.  Cianci asked Dreier to check on this information after she was terminated.  

Cianci admitted that she prepared the DHL slips herself when she used the service for her personal business and that she did not sign her name.  When she used DHL for company business she signed her name.

Cianci stated that in December of 1993, Mendez asked her if she had sent something to Italy.  Cianci replied affirmatively and indicated that it was a shipment to her nephew.  Mendez said nothing else.  She did not say Cianci was supposed to reimburse the company.

Cianci submitted the affidavit of Dreier, who stated that one of his duties as credit manager for Pettibone was "to accept and record funds from shipments of personal items on DHL, UPS and other services."  He stated "[i]t was the practice of [Pettibone] to allow such shipments without requiring reimbursement."

Defendants moved for summary judgment on the claim against Cianci and the circuit court granted the motion.  Cianci moved to reconsider, but the court denied the motion.  Cianci appealed, arguing that the court erred in granting summary judgment.

Summary judgment should be granted only when the pleadings, depositions, admissions, and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law
.  
735 ILCS 5/2--1005(c) (West 1996).  Although a plaintiff need not prove her case at this stage in the proceedings, she must present some evidentiary facts to support the elements of her claim.  
Benamon v. Soo Line R.R. Co.
, 294 Ill. App. 3d 85, 87 (1997).  This court reviews a summary judgment ruling 
de novo
.  
McNamee v. State of Illinois
, 173 Ill. 2d 433, 438 (1996).

To prove a claim of defamation, plaintiff must show that defendant made a false statement concerning plaintiff, that there was an unprivileged publication of the defamatory statement to a third party by defendant, and that plaintiff was damaged.  
Gibson v. Philip Morris, Inc.
, 292 Ill. App. 3d 267, 272 (1997), citing 
Krasinski v. United Parcel Service, Inc.
, 124 Ill. 2d 483 (1988).  Truth is a defense to a defamation action and, to establish this defense, defendant need only show the truth of the "gist" or "sting" of the defamatory material.  
Lemons v. Chronicle Publishing Co.
, 253 Ill. App. 3d 888, 890 (1993).  Only "substantial truth" is required for this defense.  
Lemons
. 253 Ill. App. 3d at 890.  While substantial truth is normally a question for the jury, where no reasonable jury could find that substantial truth had not been established, the question is one of law.  
Gist v. Macon County Sheriff's Department
, 284 Ill. App. 3d 367, 371 (1996).

Defendants first assert that summary judgment was proper because the statements were true.  In her deposition, Cianci admitted using the DHL service for personal business without reimbursing the company.  She stated, "I thought that it was okay for employees to use.  There was never anything said that we could not use it."  She claimed it was a common practice because she knew that other employees used the service for personal use, but she admitted that none of these employees had told her they were so authorized and she did not know if they reimbursed the company until she asked Dreier after she was terminated.  She also admitted that she did not sign her name when she used the service for her personal business.  

Cianci claimed Mendez authorized her use of the DHL service for personal business by approving her shipment to her nephew in Italy.  Cianci's deposition indicates that Mendez asked Cianci in December of 1993 if she had sent something to Italy and Cianci replied affirmatively and said it was to her nephew.  Cianci in essence contends that because Mendez did not say she was supposed to reimburse the company, she gave her approval.  However, there was no statement to that effect and the shipment to Italy included company brochures.  Thus, any authorization for that shipment implied from the circumstances could not have presented authorization for Cianci's numerous personal shipments.

In light of Cianci's own deposition, the undisputed facts indicate that the statements made during the meeting, in the letter, and at the hearing were substantially true.  Cianci used the company's courier service for personal use, without authorization from anyone in authority at Pettibone and without reimbursement.

Cianci argues that the circuit court erred in granting summary judgment because Hall's and Mendez's statements were defamatory 
per se
.  Under our common law, four categories of statements are considered defamatory 
per se
:  (1) words that impute the commission of a criminal offense; (2) words that impute infection with a loathsome communicable disease; (3) words that impute an inability to perform or want of integrity in the discharge of duties of office or employment; and (4) words that prejudice a party, or impute a lack of ability, in his or her trade, profession, or business.  
Bryson v. News America Publications, Inc.
, 174 Ill. 2d 77, 88 (1996).  Cianci contends the statements imputed the commission of a crime, that is, stealing money from the company, and they imputed a want of integrity in the discharge of her duties.

Even if we found the statements defamatory 
per se
, Cianci's claim must still fail because of the doctrine of qualified privilege.  A qualified privilege exists where a communication that might be defamatory is not actionable because of the occasion on which or the circumstances under which it was made.  
Gibson
, 292 Ill. App. 3d at 275.  To determine whether the privilege exists, the court must look to the occasion itself for the communication and determine as a matter of law and general policy whether the occasion created some recognized duty or interest to make the communication so as to make it privileged.   
Kuwik v. Starmark Star Marketing & Administration, Inc.
, 156 Ill. 2d 16, 27 (1993).  Three conditionally privileged occasions are recognized:  (1) situations that involve some interest of the person who publishes the defamatory matter; (2) situations that involve some interest of the person to whom the matter is published or of some third person; 
and (3) situations that involve a recognized interest of the public.  
Kuwik
, 156 Ill. 2d at 29.

The statements made by Hall during the meeting and the statements contained in the letter occurred in situations in which the interests of a third person, the employer, was involved.  See 
Gibson
, 292 Ill. App. 3d at 276 (employer had sufficient interest to know and correct situation where there was suspicion of sale of its property by employees).  The statements made by Mendez at the hearing were made in a situation in which the employer, Cianci, and the hearing officer had an interest.  See 
Barakat v. Matz
, 271 Ill. App. 3d 662, 669 (1995) (statements made in reports to worker's compensation insurers protected by qualified privilege because insurers "clearly have an interest in determining the validity of worker's compensation claims"); 
Kuwik
, 156 Ill. 2d at 29-30 (letters found to be sent on privileged occasions where they involved the interests of defendant, plaintiff, and third party).

Defendant also points out that section 1900.1 of the Unemployment Insurance Act (820 ILCS 405/1900.1 (West 1996)) provides that all communications from an employer made in connection with the administration of the Unemployment Insurance Act "shall be absolutely privileged and shall not be the basis of any slander or libel suit *** unless they are false in fact and malicious in intent."

A plaintiff can show that the qualified privilege was abused by demonstrating a direct intent to injure another or a reckless disregard of the defamed party's rights and of the consequences that may result to her.  
Kuwik
, 156 Ill. 2d at 30.  An abuse of the privilege may consist of "any reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties."  
Kuwik
, 156 Ill. 2d at 30;  
Barakat
, 271 Ill. App. 3d at 669-70.

The record fails to present facts to indicate that the defendants acted with an intent to injure Cianci or in reckless disregard for her rights.  As discussed above, Cianci's deposition indicates that the statements were essentially true.  She has not presented anything to indicate that Hall in fact knew that the statements were false or acted in reckless disregard as to the matter's falsity.  Even if other employees used the service for personal use and Cianci believed she could do so without reimbursement, there is nothing to indicate that Hall knew of any company authorization for such activity.  Further, Cianci's deposition indicates that Hall made the statements in a meeting among a small group of employees involved in the situation.

In addition, Cianci failed to present facts to show that Hall's alleged statements to other employees were actually published.  See 
Gibson
, 292 Ill. App. 3d at 275 (publication is essential element of cause of action for defamation).  While Cianci stated that other employees knew about her suspension and dismissal, she did not know how they knew the information and offered nothing to further prove that Hall published the information to those individuals.

With regard to the statements made by Mendez during the hearing on the worker's compensation claim, Cianci has failed to present facts to show an intent to injure, a reckless disregard for her rights, or a malicious intent.  As discussed, the statements were substantially true.  While Cianci alleged that Mendez knew the information was false because she had approved the conduct, her deposition states only that Mendez did not object to Cianci's shipment of brochures to her nephew in Italy and that Mendez may have used the service herself for personal use.  The facts do not support her claim that Mendez approved the shipment without reimbursement or authorized Cianci's numerous other personal shipments without reimbursement.

Because Cianci failed to present facts supporting her claims for defamation, we hold that the circuit court properly granted defendants' motion for summary judgment.

On September 27, 1995, Nowosad filed her first amended complaint against defendants alleging defamation.
(footnote: 2)  According to the complaint, on April 15, 1994, Hall falsely stated in the presence of others that Nowosad made personal shipments via DHL courier services, charged the services to Pettibone without permission from anyone in authority at the company, did so secretly, and personally profited from the shipments.  Nowosad further alleged that on April 19, 1994, Hall published a letter making "allegations of illegal DHL use by [Nowosad]" and terminating her employment.  Nowosad alleged that the letter was published to other employees of Pettibone.  Nowosad alleged that Hall knew that the statements were false because it was "a common practice among [Pettibone] employees to use DHL as a fringe benefit of employment, which for several prior years [had] been approved by [Pettibone] management."

Nowosad also alleged that Mendez falsely testified before an unemployment compensation hearing officer in regard to Nowosad's claim for benefits, stating that Nowosad "had been fired for *** taking company money via personal use of DHL at company expense."  Nowosad claimed Mendez was aware of other employees using DHL for personal letters at company expense and Mendez herself used DHL for personal letters at company expense.

During a bench trial, Nowosad testified that on April 15, 1994, she was called into a meeting attended by Hall, Mendez, Bob Mitchell, Tony Odarczenko, and Cianci.  At the meeting she and Cianci were accused of using DHL services without reimbursing the company.  She and Cianci were presented with a list of instances of unreimbursed personal use of courier services.  She later received a letter from Hall terminating her employment.  She did not offer this letter into evidence.

Nowosad indicated that a practice existed at Pettibone by which employees used courier services for personal business at the company's expense.  She admitted on cross-examination that no one from Pettibone had ever told her that she was authorized to use the courier at the company's expense for her own personal business.  She also admitted giving Cianci an order for personal checks and then later learning that Cianci had used DHL at the company's expense to send the order.  She never reimbursed the company for the charges.

Cianci testified that she also was accused at the meeting of misusing the courier service without reimbursing the company.  She stated that it was common practice for Pettibone employees to use the courier services.  She knew of several employees who also used the service for personal business.  She named several individuals, including Mendez.  Cianci stated that a year prior to the termination she had sent something to her nephew in Italy and Mendez yelled out when she received the DHL receipt, "Enrica, is this your shipment to Italy, to your nephew?"  Cianci replied affirmatively and Mendez never requested reimbursement.  Cianci admitted on cross-examination that she had in fact sent the packages listed on the company's document and in each instance she failed to sign her name as would otherwise be the custom when doing company business. 

John Dreier, credit manager for Pettibone, testified that he thought that the employees' use of the courier at company expense was a "perk" of their employment.  However, he had no knowledge of any official policy in that regard.  He stated that part of his job was to receive payments from employees for the use of courier services.  He never received any such payments prior to the time Nowosad and Cianci were terminated.   

Dreier further stated that Odarczenko told him that Nowosad and Cianci "were fired for stealing from the company by using DHL services."  He also stated that he indirectly heard Mendez state at a hearing "of some type" that Nowosad and Cianci were "fired for stealing for [
sic
] DHL Services."  While these allegations were not pled in her complaint, Nowosad sought to amend during closing argument to include these statements.

The circuit court determined that "each unpled, allegedly defamatory statement constitutes an additional cause of action, albeit under the same rubric of defamation, of which the defendant had no notice and for which it had no opportunity to prepare a defense."  The court denied Nowosad's motion to amend.

The circuit court then determined that Hall's statements were subject to qualified privilege and, therefore, even if defamatory, they were not actionable.  The court found the communication motivated by a legitimate business interest, that is, seeking to reduce employee theft.  The court also stated that it did not

"find credible or plausible the evidence seeking to establish that the unauthorized use of courier services by employees at their employer's expense was an authorized practice.  At best, [Nowosad] has established that many employees did it with impunity.  Her logic fails in the apparent conclusion that that made the behavior acceptable."

The court further ruled:

"With respect to the letter of April 19, 1994, in which [Nowosad] was notified of her termination and the reasons for it, the evidence does not establish that the contents of the letter were ever published to non-management employees of the Pettibone Corporation or to anyone else for that matter.  Thus, the unpublished letter cannot support an action for defamation."

With regard to the statements made by Mendez at the unemployment compensation hearing, the court determined that those statements would enjoy an absolute privilege under section 1900.1 of the Unemployment Insurance Act (820 ILCS 405/1900.1 (West 1996)) unless they are false and malicious.  The court found the evidence to indicate that the statements were not false or malicious.  It stated:

"Mendez's statement that plaintiff misappropriated courier services for personal gain at her employer's expense, or words to that effect, was not false.  In fact, the audit conducted by the defendant revealed plaintiff's complicity in Ms. Cianci's misuse of the courier services.  She admitted that in fact she did give Ms. Cianci an order for personal checks and that she did receive those checks sometime thereafter at her residence.  The fact that she denied knowledge of Ms. Cianci's misuse of the courier service and that in any event it was common practice for employees to use the services, merely supplies a defense to the allegations.  It does not establish their falsity."

The circuit court ruled that the evidence did not support a finding of reckless disregard for the truth or falsity and it entered judgement for defendants.  Nowosad moved to reconsider, but the court denied the motion.  Nowosad now appeals, arguing that the circuit court erred in denying her request to conform the pleadings to the trial proof and it erred in ruling that defendants did not abuse the qualified privilege.

Section 2--616(c) of the Code of Civil Procedure provides that a pleading may be amended "at any time, before or after judgment, to conform the pleadings to the proofs."  735 ILCS 5/2--616(c) (West 1996).  The decision to allow an amendment to a complaint lies within the sound discretion of the circuit court, and its decision will not be disturbed absent an abuse of discretion.  
Luther v. Norfolk & Western Ry. Co.
, 272 Ill. App. 3d 16, 26 (1995).  Among the factors to be considered in determining whether to permit an amendment to the pleadings are whether the amendment would cure a defect in the pleading, whether the amendment would cause the defendant prejudice or surprise, the timeliness of the proposed amendment, and whether there were previous opportunities to amend.  
Lee v. Chicago Transit Authority
, 152 Ill. 2d 432, 467-68 (1992).

In denying the motion to amend the complaint, the circuit court determined that each unpled allegedly defamatory statement constituted an additional cause of action of which defendants had no notice and no opportunity to prepare a defense.  Nowosad failed to plead any facts regarding statements made by Odarczenko to Dreier or statements overheard by Dreier at the unemployment compensation hearing.  She made three allegations of defamation:  (1) that Hall made defamatory remarks during the April 15 conference; (2) that Hall published a letter to other employees; and (3) that Mendez falsely testified to the hearing officer.  There was nothing indicating that defendants would have to dispute the claims proposed in the amendment as related to Dreier.
(footnote: 3)  It was not until closing statements that Nowosad first indicated that she intended to pursue claims based on Odarczenko's statements to Dreier.  At this point in the proceeding it was too late for defendants to present evidence to dispute these additional claims.  We see no abuse of discretion in denying the motion to amend.  See 
Arroyo v. Chicago Transit Authority
, 268 Ill. App. 3d 317, 323-24 (1994) (affirming denial of motion to amend complaint immediately prior to trial and denial of motion to conform pleadings to proofs).

Nowosad also argues that the circuit court erred in ruling that Hall's statements enjoyed a qualified privilege.  As discussed with regard to Cianci's claims, even if we found Hall's statements defamatory 
per se
, Nowosad's claim must still fail because of the privilege.  Hall's statements at the April 15 meeting were made during a situation in which an interest of a third party, the employer, was involved.  Further, as a supervisor Hall had an interest in confronting the employees.

Nowosad also argues that even if the statements of Hall and Mendez were privileged, the privilege was lost because they knew of the company policy of free use of DHL when they published the statements.  The circuit court did not find the evidence asserting an authorized practice of using the company's courier services at the employer's expense to be "credible or plausible."  None of the witnesses testified that they knew of actual authorization for the practice.  The record does not establish that when Hall and Mendez made their statements they acted with an intent to injure Nowosad or in reckless disregard for her right to be free from slander.

The circuit court noted that Mendez's statement that Nowosad misappropriated courier services for personal gain at her employer's expense, or words to that effect, was not false.  Nowosad admitted that she gave Cianci the order for personal checks and that she received those checks sometime thereafter at her residence.  She did not reimburse the company after she learned that Cianci used the courier service at the company's expense to send the order.  The fact that she denied knowledge of Cianci's misuse of the service and that it was common practice for employees to use the services, does not establish that Mendez's statements were false or malicious.  Nowosad has failed to demonstrate any reversible error.  We therefore affirm the judgment for defendants.

For the aforementioned reasons, we affirm the rulings of the circuit court.

Affirmed.

ZWICK and QUINN, JJ., concur.

FOOTNOTES
1:
Cianci also brought claims for breach of contract and intentional infliction of emotional distress, but those counts were dismissed.

2:
Nowosad also brought claims for wrongful termination and intentional infliction of emotional distress, but those claims were dismissed prior to trial.

3:
Dreier's testimony with regard to Mendez only related to statements he heard indirectly at the hearing.  We note that the complaint included and the court addressed the issue as to Mendez's testimony at the hearing as discussed below.