HOLLYMATIC CORPORATION,
Plaintiff,

v.

DANIELS FOOD EQUIPMENT,
INC., Defendant.

No. 97 C 5514.

United States District Court,
N.D. Illinois,
Eastern Division.

March 26, 1999.

Peter M. King, Leslie F. Notaro, Canel, Davis & King, Michael J. Charysh, Charysh & Schroeder, Ltd., Chicago, IL, for Plaintiff.

Stephen T. Mikus, Menges, Mikus & Molzahn, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Although the procedural history of this case is somewhat tortured, it essentially poses a standard contract dispute that ar-rived in this District Court via removal from the Circuit Court of Cook County on diversity jurisdiction grounds. Each of Hollymatic Corp. ("Hollymatic") and Daniels Food Equipment, Inc. ("Daniels Food"), in its initial pleadings, alleged that the other breached the contracts that provided for a distributor-manufacturer relationship between the companies. Daniels Food then filed an Amended Counterclaim ("A.Cc.") to add a Count III that claimed defamation per se by Hollymatic, based on a sales bulletin that Hollymatic had sent to its dealers about the conflict between the two companies.

Hollymatic now moves for summary judgment under Fed.R.Civ.P. 56 ("Rule 56") on Daniels Food's A. Cc. Count III—the defamation claim. Both parties have briefed their positions fully, and the issue is ready for decision. For the reasons set out in this memorandum opinion and order, Hollymatic's partial summary judgment motion is denied.

### Summary Judgment Standards

Familiar Rule 56 principles impose on a party seeking summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n .2 (7th Cir.1997)). That stance is reflected in the ensuing *Facts* section. As for the applicable law, this opinion follows the parties' treatment that looks to Illinois common law in this diversity case.

### Facts

In May 1992 Hollymatic and Daniels Food entered into a manufacturing agreement and a distributing agreement. Those agreements provided that Daniels Food would be Hollymatic's exclusive man-

ufacturer and that Hollymatic would be Daniels Food's exclusive distributor for some of the food equipment products that Daniels Food manufactured.[1] Included in those contracts was a termination provision that allowed either party to end the relationship by giving the other party six months' notice, though the parties would still be required to perform their contractual obligations during that notice period.

Beginning in early 1996 the relationship between the two companies soured. Daniels Food president Ed Daniels ("Daniels") sent a letter to Hollymatic on March 7, 1996 providing the requisite six-months' notice of his intent to terminate the agreements (D.Ex. 2[2]). Following an April 4, 1996 meeting among Daniels, Hollymatic CEO Jim Azzar ("Azzar") and others including Hollymatic attorney Peter Tolley ("Tolley"), Tolley wrote Daniels a letter stating that he was confirming that Daniels Food had withdrawn its termination notice at that meeting (D.Ex. 5). Although Daniels testified during his deposition that he did not agree to withdraw the notice (Daniels Dep. 272–73), he never responded to Tolley's letter. Instead he asserted in a post-deposition January 22, 1999 affidavit that he was waiting to clear things up at a planned June meeting that Azzar later canceled (Daniels 1999 Aff. ¶¶ 4–6). According to Daniels 1999 Aff. ¶ 7, he kept telling Hollymatic people other than Azzar (whom he did not want to antagonize) that the exclusive arrangement would not exist once the six-month notice period ran out.

For the next year (well past the end of the six-month period) business between the companies appeared to continue smoothly, with Daniels Food (as before) continuing to provide all of its line of products to Hollymatic, although Daniels tried unsuccessfully to arrange a meeting with Azzar. Then on April 21, 1997 Daniels sent Hollymatic a letter stating that Hollymatic did not have exclusive rights over Daniels Food's products, as originally set forth in the March 7, 1996 termination notice letter (H.Ex. 2). That led to a May 28, 1997 meeting between Daniels Food and Hollymatic representatives, including both Daniels and Azzar, which ended shortly after it began because of contentious disagreements about whether the original contracts were still in effect.

Immediately after that May meeting Azzar stopped payment on all Daniels Food invoices. Daniels then told Hollymatic employees that he would be willing to ship equipment to Hollymatic only if it was paid for C.O.D. Daniels also started referring all customers calling with technical questions to Hollymatic, which had previously preferred to provide the first line of defense on service issues anyway. In the meantime Hollymatic was having difficulty with dealers whose orders it could not fill because of the conflict with Daniels Food.

On August 11, 1997 Hollymatic sent a sales bulletin to its roughly 60 to 70 exclusive dealers that contained the allegedly defamatory statement. That letter stated in part (A.Cc.Ex. 2):

> Daniels Food Equipment and Hollymatic Corporation are currently engaged in litigation regarding Daniels Food Equipment's breach of its manufacturing and distribution agreements with Hollymatic. As many of you know, Daniels Food Equipment has refused to honor technical support, warranty claims and open purchase orders for Hollymatic, notwithstanding its contractual obligations.

It then went on to assure the dealers that Hollymatic was replacing the Daniels Food line and to remind them of their exclusivity agreements with Hollymatic, which required them to get express written consent

---

1. Although the written agreements covered only some of Daniels Food's products, it appears that in practice Daniels Food was providing all of its products to Hollymatic on an exclusive basis.

2. This opinion refers to Daniels Food's exhibits as "D. Ex.—" and to Hollymatic's exhibits as "H. Ex.—."

from Hollymatic before selling competitive products.

Contract litigation between Hollymatic and Daniels Food had commenced that summer of 1997, before Hollymatic distributed the just-quoted sales bulletin. After Daniels Food amended its previously filed counterclaim on August 6, 1998 to add the Count III defamation count based on the statement in that bulletin, Hollymatic responded with three defenses in its motion for partial summary judgment: (1) the statement in the bulletin was substantially true and thus cannot be defamatory; (2) Hollymatic had a qualified privilege to make the statement and did not abuse that privilege; and (3) Daniels Food has suffered no damages.

### Substantial Truth

Hollymatic's first defense to the defamation claim is that the allegedly defamatory statement was instead substantially true. As should be obvious from the earlier-quoted portion of the sales bulletin, Daniels Food bases its defamation count on the second quoted sentence that charges it with breaching its contractual obligations.

■ Truth is an absolute defense to a defamation claim, for an essential element of any such claim is that the statements made by the defendant (here counterdefendant) were false (see *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *Cianci v. Pettibone Corp.,* 298 Ill.App.3d 419, 424, 232 Ill.Dec. 583, 698 N.E.2d 674, 678 (1st Dist.1998)). To prove defamation per se under Illinois law, a plaintiff must demonstrate a false statement that imputes something that falls within one of four categories: (1) the commission of a criminal offense, (2) infection with a loathsome communicable disease, (3) malfeasance or misfeasance in the discharge of duties of employment or (4) unfitness for one's trade, profession or business (see *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1226 (7th Cir.1993); *Mittelman v. Witous,* 135 Ill.2d 220, 238–39, 142 Ill.Dec. 232, 552 N.E.2d 973, 982 (1989)). If the alleged defamation falls into one of those four categories, "[t]he words themselves are considered to be so obviously and inevitably hurtful to the plaintiff that damage to his reputation may be presumed" (*Mittelman, id.* at 239, 142 Ill.Dec. 232, 552 N.E.2d at 982). As this Court decided in its two-page September 16, 1998 memorandum opinion and order, Hollymatic's statement falls into the third and fourth defamation per se categories because it "attack[ed] the integrity of a business' conduct in the marketplace, or prejudic[ed] a party in its business."

■ Hollymatic argues, however, that Daniels Food has not met its burden of proving the statement was false—or put a bit differently, it was not substantially true. To establish that defense Hollymatic "need only show the truth of the 'gist' or 'sting' of the defamatory material" (*Cianci,* 298 Ill.App.3d at 424, 232 Ill.Dec. 583, 698 N.E.2d at 678 (citation omitted)). While normally that determination would be made by a jury, a court can hold that the allegedly defamatory statement is substantially true as a matter of law if no reasonable jury could find that substantial truth had not been established (*id.,* 232 Ill.Dec. 583, 698 N.E.2d at 679).

■ No such holding is appropriate here because genuine issues of material fact exist regarding the substantial truth of Hollymatic's statements. First, the parties dispute vigorously whether Daniels Food was under any contractual obligation whatever in August 1997—indeed, that is the subject of the other claims and counterclaims in this action.[3] It therefore cannot be said on the present motion that

---

**3.** That issue is not controlled by the parties' continued performance past the end of the six-month notice period. If Daniels' version of events is credited (as it must be for the present Rule 56 motion), the parties' ongoing performance would have been at will—with either party free to terminate or to modify the terms of the relationship at any time.

Hollymatic's assertion—that Daniels Food dodged its "contractual obligations" by refusing to provide technical support, honor warranty claims and fill orders—was true as a matter of law.[4]

Second, Hollymatic's statement that Daniels Food "refused" to provide technical and warranty support and to honor open purchase orders is disputed by Daniels. As to the latter, according to Daniels and Daniels Food it was willing to ship equipment if it was paid C.O.D.—it would not ship products on credit only because Hollymatic refused to make payments. As for the first asserted "refusal," Daniels acknowledged that Daniels Food employees had begun referring technical calls to Hollymatic, but he explained that was Hollymatic's preference even before May 1997. Daniels further stated that a Hollymatic employee had suggested the service reference arrangement. All of those assertions, when credited as they must be for now, would render untrue Hollymatic's statement that Daniels Food "refused" to provide support and fill purchase orders in contravention of its obligations.

Daniels Food also disputes Hollymatic's statement that Daniels Food refused to honor warranty claims. According to Daniels Food, Hollymatic sent no warranty claims to Daniels Food until several months after it distributed the August 11 sales bulletin (D.Mem.¶ 14). When Hollymatic did eventually send some warranty claims, it did not provide crucial information that Daniels Food needed and requested to enable it to process the claims. Hollymatic, on the other hand, claims that even before Hollymatic distributed the offending sales bulletin, Daniels Food had held returned warranty items without acting on them. That dispute too must be viewed from Daniels Food's perspective for present purposes.

4. Because the parties themselves did not raise the issue, this opinion does not address the question whether the statement about "contractual obligations"—something amounting to a legal conclusion—might not fall within

In sum, there are several genuine issues of material fact that bear upon the substantial truth vel non of Hollymatic's August 11 statement. This Court therefore cannot credit that defense to rule in Hollymatic's favor.

### Qualified Privilege

 Next Hollymatic asserts both (1) that it had a qualified privilege to make the allegedly defamatory statement in its sales bulletin and (2) that it did not abuse that privilege. Illinois law recognizes a qualified privilege when (1) the publisher of alleged defamatory statements has some interest at stake or (2) an interest of the recipient of the material or some third person is involved or (3) a recognized public interest is implicated (*Kuwik v. Starmark Star Mktg. and Admin., Inc.*, 156 Ill.2d 16, 29, 188 Ill.Dec. 765, 619 N.E.2d 129, 135 (1993)). If the court, after "determin[ing] as a matter of law and general policy whether the occasion [for the communication] created some recognized duty or interest" (*id.* at 27, 188 Ill.Dec. 765, 619 N.E.2d at 134), finds a communication to be privileged, then plaintiff must meet a higher threshold of proof—actual malice—to make its defamation case. *Kuwik, id.* at 30, 188 Ill.Dec. 765, 619 N.E.2d at 135–36 (quotation marks and citations omitted), defined that higher burden:

> We now hold that to prove an abuse of the qualified privilege, the plaintiff must show a direct intention to injure another, or a reckless disregard of the defamed party's rights and of the consequences that may result to him. Thus, an abuse of a qualified privilege may consist of any reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties.

the realm of potentially defamatory material because it could be considered as opinion rather than fact. No views are expressed on that question in this opinion.

Whether a defamation defendant has a qualified privilege is a question of law for the court, while whether the defendant abused its privilege is a question of fact for the jury (*id.* at 27, 188 Ill.Dec. 765, 619 N.E.2d at 134).[5]

This opinion turns, then, to an evaluation of Hollymatic's privilege claim in those terms. It first examines the existence of the privilege, then considers whether there was an abuse of the privilege.

■ On the first facet, Hollymatic argues that it had a legitimate business interest in communicating with its authorized dealers about the Daniels Food conflict. It says that it needed to inform its dealers that it was gearing up to manufacture products previously provided by Daniels Food, and that it needed to remind its dealers about the exclusivity provisions of their dealer agreements. Hollymatic had failed to fill some dealer orders because of the Daniels Food situation, and it was important to reassure its dealers that the situation would not continue. Moreover, one Hollymatic dealer had actually ordered some equipment directly from Daniels Food, so Hollymatic felt it should emphasize that its own dealer exclusivity agreements were still in effect. Reinforcement of those exclusivity agreements was also important to Hollymatic because one of its competitors had announced, a few days before Hollymatic sent the sales bulletin, that it would carry Daniels Food products (H.Ex. 4). Taking all of those factors into consideration, this Court agrees that Hollymatic had important business interests in corresponding with its dealers about the Daniels Food conflict, so that

its communication was qualifiedly privileged.

■ But that does not control the second branch of the privilege inquiry. To find for Hollymatic on that score as a matter of law, this Court would have to decide that no reasonable juror could conclude that Hollymatic had abused its privilege by acting recklessly toward Daniels Food's rights. But that decision cannot be reached at this point, for genuine material factual issues exist both as to Hollymatic's good faith in making its allegedly defamatory statement and as to the scope of the statement it made.

For example, the documents submitted by the parties do not reveal (1) whether Daniels Food actually refused to process warranty claims before Hollymatic made the allegedly defamatory statements and (2) whether Hollymatic would have known of that refusal at the time it drafted the sales bulletin. It is also unclear whether it was actually a Hollymatic employee who suggested that Daniels Food start referring service calls to Hollymatic. Still another contested issue is the relationship between Daniels Food's offer to provide products on a C.O.D. basis and Hollymatic's assertion that Daniels Food refused to honor open purchase orders.

In the course of assessing the factual issues that bear on Hollymatic's good faith, under *Kuwik* a jury is also entitled to consider whether Hollymatic was reckless in not limiting the scope of its statements against Daniels Food. Hollymatic's privilege extends to statements made to protect the earlier-described interests in reaffirming the exclusive dealership contracts and

<hr>

5. *Kuwik* marked a change in Illinois privilege law regarding the distribution of tasks between judge and jury. Before that decision the court's privilege inquiry had five prongs: whether the statements (1) were made in good faith (2) by a person with an interest or duty to uphold, (3) were limited in scope to that purpose, (4) were made on a proper occasion and (5) were published only to proper parties (*Mittelman,* 135 Ill.2d at 236–37, 142 Ill.Dec. 232, 552 N.E.2d at 981). *Kuwik,*

156 Ill.2d at 26, 188 Ill.Dec. 765, 619 N.E.2d at 133–34 recognized, however, that it was illogical for the court to find that a party had acted in good faith so that a privilege applied, then ask a jury to determine whether that same party had acted with reckless disregard. *Kuwik* therefore adopted a more generalized, less fact-driven privilege test and left the factual issues (such as good faith) in the hands of the jury under the rubric of abuse of the privilege.

in reassuring dealers that products would be shipped as ordered. But the allegedly offending sentence does not necessarily address those protected interests at all. Recklessness will no doubt be difficult for Daniels Food to prove, but a jury might reasonably decide that Hollymatic was reckless in not limiting the scope of its communication, and this Court is not going to remove that determination from its hands.

In summary, although Hollymatic's communications with its authorized dealers are qualifiedly privileged, this Court will leave to the jury whether it abused that privilege. Accordingly, partial summary judgment is denied on that ground as well.

### Damages

Hollymatic's final argument is that Daniels Food has suffered no damages and therefore judgment should be entered against it. But that distorts the basic concept of defamation per se. Daniels Food's advantage in advancing a facially valid claim of such defamation is that it need not prove actual reputational damage because such injury is presumed (see *Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1138 (7th Cir. 1987)). Case law cited by Hollymatic simply does not support its argument in that respect. Its motion for partial summary judgment on that ground is also denied.

### Conclusion

Because there are genuine issues of material fact, Hollymatic's motion for partial summary judgment is denied. This Court finds, however, that Hollymatic has a qualified privilege under Illinois defamation law.