THIRD DIVISION

August 22, 2001

No. 1-00-3764

THEODORE E. PARKER, P.E., ) Appeal from the 

)   Circuit Court of 

Plaintiff-Appellant, ) Cook County, Law Division.

) 

v. ) 

) No. 98 L 2069

HOUSE O'LITE CORPORATION ) 

d/b/a HOLCOR and SUSAN M. LARSON, )

individually and as President of HOLCOR ) The Honorable 

) David G. Lichtenstein,

Defendants-Appellees. ) Judge Presiding.

JUSTICE WOLFSON delivered the opinion of the court:

The free flow of information on matters of compelling public interest is highly prized in our society.  There are times when someone speaking out on such a matter gets the facts wrong and ends up defaming someone else.  For these occasions the law provides a qualified privilege, one that can be abused and lost.  This case requires us to examine whether the defendant defamed the plaintiff, whether she was protected by a qualified privilege, and, if the privilege did exist, whether it was abused.

INTRODUCTION

Plaintiff Theodore E. Parker, P.E. (Parker), brought this suit for defamation 
per
 
se
 and false light invasion of privacy against defendant Susan M. Larson, individually and in her capacity as President of House O'Lite Corporation d/b/a Holcor (collectively Larson), alleging Larson published false and defamatory statements when she wrote two letters questioning his specifications for lighting fixtures to be used in a multi-million dollar project to build a new Cook County Hospital (CCH).

Larson moved for summary judgment, contending the letters she wrote were substantially true and were privileged communications.  The trial court entered an order granting summary judgment, finding that because her statements in the letters involved a matter of public interest, i.e., construction of a public hospital using taxpayer monies, they were privileged communications.

On appeal, Parker contends the trial court erred in granting summary judgment on his claim for defamation 
per
 
se
 because Larson's statements in her two letters were not privileged communications, and if Larson's statements were found to be privileged, the trial court should have allowed a jury to determine whether she abused that privilege.  Parker also contends the trial court erred in granting summary judgment on his false light claim "where the record contained substantial evidence of actual malice," sufficient to raise material questions of fact.  We reverse the trial court's order granting summary judgment and remand for further proceedings.

FACTS

In 1994, Cook County (County) received approval to build a new state-of-the-art hospital.  The new CCH would replace the old CCH on the near west side of Chicago.  The County hired Turner Construction (Turner) as the program manager to oversee the CCH project.

As program manager, Turner was to oversee the work of a design team of private architectural and engineering firms.  The design team comprised a partnership or joint venture of four private firms.  These firms were responsible for designing the hospital and preparing drawings, plans, and specifications that detailed how the hospital was to be built, including the types and quantities of materials for the project.

Globetrotters Engineering Corporation (Globetrotters) was one of four private firms selected in early 1997 to form the design team for the CCH project.  Although Globetrotters was retained by the County to do the electrical and mechanical design work, including lighting design and specification, the County’s agent on the CCH project always was Turner.

Parker was employed by Globetrotters as a senior electrical engineer.  He was responsible for the electrical and lighting design for the new CCH.  His responsibilities included the drafting of a lighting fixture schedule or specifications of fixtures to be installed in the new CCH. 

Parker drafted the lighting specifications which became the subject matter of this lawsuit.  Although he was responsible to ensure the information on the lighting specifications was accurate and met Globetrotters’ quality assurance guaranties before he sent it out for bidding in January 1998, he sent out "incomplete" lighting specifications.

In the fall of 1997, Larson decided she wanted to sell Holcor products for use in the CCH project.  At the time, she was president of Holcor.  Holcor was a women’s business enterprise (WBE) that manufactured, among other things, fixtures for institutional applications such as hospitals.

Larson was disturbed by Parker’s lighting specifications for the CCH project.  Specifically, she believed they authorized bids from companies that were not manufacturers, did not meet Globetrotters’ quality specifications, and/or were owned or affiliated with Jeff Baum of Total Lighting Resources (TLR) and Design Galleries.  She felt Baum was preferred on the lighting specifications because of a rumored "special relationship" between Baum and Parker, i.e., they were brothers-in-law.

After Larson conducted an investigation of Parker and spoke to several people in the lighting industry familiar with the CCH project, she met with Turner's Ken Mullin, the program manager who represented the County on the CCH project.  They discussed Larson’s concern that Parker "rigged" the lighting specifications of the CCH project in favor of his "brother-in-law" Baum.  Mullin, after conducting his own investigation, told Larson he could not substantiate any of her concerns and/or allegations.  Mullin declined to investigate Parker’s lighting specifications any further, causing Larson to write the letters which led to this lawsuit.

DECISION

STANDARD OF REVIEW

Parker contends the trial court erred in granting summary judgment in favor of Larson on his defamation 
per
 
se
 and false light invasion of privacy claims. 

Summary judgment is appropriate where "the pleadings, depositions and admissions, together with the affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  
Vickers v. Abbott Laboratories
, 308 Ill. App. 3d 393, 399, 719 N.E.2d 1101 (1999)
, citing 735 ILCS 5/2-1005(c) (West 1996).  The party opposing summary judgment does not have to prove his or her case, but must present some factual basis arguably entitling him or her to judgment.  
Dunlap v. Alcuin Montessori School
, 298 Ill. App. 3d 329, 338, 698 N.E.2d 574 (1998). 

We note that while summary judgment is "encouraged as an aid in the expeditious disposition of a lawsuit [citation], it is a drastic means of disposing of litigation and therefore should be allowed only when the right of the moving party is clear and free from doubt. [Citations.]"  
Vickers
, 308 Ill. App. 3d at 399, quoting 
Purtill v. Hess
, 111 Ill. 2d 229, 240, 489 N.E.2d 867 (1986).  

We review 
de
 
novo
 the trial court's ruling on a motion for summary judgment.  
Vickers
, 308 Ill. App. 3d at 399.  Although the scope of our review of a summary judgment motion is limited to the record as it existed at the time the trial court ruled, we are not restricted to the exact reasons the trial court stated or implied in entering its order.  
Dunlap
, 298 Ill. App. 3d at 338.  We may affirm the trial court's decision for any reason in the record, regardless of its basis for the decision.  
Dunlap
, 298 Ill. App. 3d at 338.

DEFAMATION

To prove defamation, a plaintiff must show (1) the defendant made a false statement about the plaintiff, (2) there was an unprivileged publication to a third party with fault by the defendant, and (3) the publication damaged the plaintiff.  
Vickers
, 308 Ill. App. 3d at 400.  

The law of defamation is well-settled:

"A statement is considered defamatory if it tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with him. [Citations.]  Certain limited categories of defamatory statements are deemed actionable 
per
 
se
 because they are so obviously and materially harmful to the plaintiff that injury to the plaintiff's reputation may be presumed."  
Van Horne v. Muller
, 185 Ill. 2d 299, 307, 705 N.E.2d 898 (1998).

Illinois recognizes five categories of statements which are considered actionable 
per
 
se
, two pertinent to this case:  (1) those imputing the commission of a criminal offense; and (2) those imputing an inability to perform or want of integrity in the discharge of duties of office or employment.  
Van Horne
, 185 Ill. 2d at 307.  In determining whether the statement is defamatory, we must "focus on the predictable effect the statement had on those who received the publication."  
Dunlap
, 298 Ill. App. 3d at 339.

This case centers on Larson's January 12, 1998, letter.  We set it out in full:

"Mr. Ken Mullin, Project Executive

Turner Construction Company

230 S. LaSalle Street

Chicago, IL 60604-1413

Dear Ken,

Enclosed is some of the documentation on the Cook County hospital lighting specifications that we have discussed on several previous occasions.

Our concern, as we have advised, is that 
the specification of the lighting is rigged.
  The specifications are written so that only one lighting representative, Mr. Jeff Baum, of TLC and Design Galleries, has a complete lighting package.  In our industry, if you cannot present a complete lighting package, you are usually unable to bid the job competitively or successfully.

As shown in the attached spreadsheet, only Mr. Baum is able to bid the entire job.  In several cases, the spec does not list "apples to apples".  For example, Mr. Baum’s fixture is listed against higher quality, higher cost products, giving him a price advantage in supplying a lesser quality product.  Additionally, on one item, F24R, Mr. Baum is listed as the only approved fixture, as a "one name spec".  As a comparison, we have only included P&G, the agent able to bid the most items.  P&G has bid items that are not approved to improve the coverage of the bid.  Other agents have far fewer items than P&G that they are able to bid and have little chance of winning the job. 

Our concerns are exacerbated by the fact that the specifier, 
Mr. Ted Parker of Globetrotters, is Mr. Jeff Baum’s brother-in-law.  It appears that he has rigged the specifications so that only his relative can bid and win the job.

In addition, 
Globetrotter's Mr. Parker has violated his own specifications in rigging this bid.
  In the "Quality Assurance" section of the Lighting requirements, the specifications read as follows:

Section 16510, 1.3 Quality Assurance

A Manufacturer's Qualifications: Firms regularly engaged in the manufacture of interior lighting fixture of the types and ratings required, whose products have been in satisfactory use in similar service for not less than 5 years.

Globetrotter's Mr. Parker has listed 2 companies that exist in name only and do not meet this specification.  
They are PMC and Lexes.  
These companies are owned by Mr. Jeff Baum, Mr. Parker’s brother-in-law, and are not manufactures in any sense of the word.
  Mr. Baum’s non-existent manufacturers represent $500,000 of the lighting requirements, or 25-30% or more of this $2 million lighting job (manufacturers' level pricing).

Mr. Baum's "manufacturers" purchase lighting from other real manufacturers and submit it as their own.  There is no factory, no employees and the firms have never made a lighting fixture.  Mr. Baum is currently working with a small local lighting manufacturer to supply the items specified as PMC and Lexes on this job.  This manufacture has not previously made these fixtures.

Globetrotter's Mr. Parker has a history of specifying jobs in this fashion in the past.  However, the situations where this has occurred have not been of the magnitude of the Cook County Hospital job.  The most recent previous example of this that we are aware of, occurred on Northwestern’s Dyche Stadium.  In that case, Mr. Parker also specified the bid so that only Mr. Baum could bid and win the job.  In that case, he even refused to approve one of the manufactures that PMC, one of Mr. Baum's non-existent manufacturers, was buying from.  He would only approve it if the item bore a PMC name.

We object to the situation occurring again on Cook County Hospital.

There are a number of fixtures that our company, HOLCOR, is able to provide on this job.  However, Mr. Parker has refused to meet with us and our agent has refused to accept our submittals and has stood us up for arranged appointments.

As the only WBE and DBE manufacture in the Chicago area, we want and need to be represented on this project.  The way that the lighting has been specified, is being bid, and appears will be awarded violates all the rules of fairness and ethics.  It also presents a situation where it is unlikely that the contractor, and ultimately the Hospital and the taxpayers, will get the most competitive price available.

We request the following actions to be implemented immediately to correct this problem:

1.   All the specifications be changed to "or equal".

2.   PMC and Lexes be removed from the specifications, as they are not manufactures.

Globetrotter's Mr. Parker’s conflict of interest be recognized and addressed.

As this project is bidding in the next week, we request your immediate attention and response.

Sincerely,

Susan M. Larson

President

CC: Mr. Richard Devine, Cook County States Attorney

Mr. Lewis Matuszewich, Bowles, Kesting, Hering, Matuszewich & Fiordaliel

Mr. Niranjan Shah, CEO, Globetrotters

Mr. William H. Moore, President, Globetrotters."  (Emphasis in original.)

On January 13, 1998, Larson sent a letter containing nearly identical statements to Richard Devine, Cook County State's Attorney.  The January 13 letter indicates copies were sent to the same individuals listed in the January 12 letter.

The trial court found, and the parties do not dispute, the complained-of statements by Larson were published.  
Vickers
, 308 Ill. App. 3d at 400 ("Proof of publication requires that the defamatory statements were communicated to some person other than the plaintiff").  

In addition, the trial court, in its order granting Larson's motion for summary judgment, said: "For purposes of the pending motion for summary judgment, and without in any way deciding the matter, the court treats the complained of statements made by Holcor[, i.e., Larson,] as defamatory 
per
 
se
."  When a defamatory statement is actionable 
per
 
se
, the plaintiff does not have to plead or prove actual damage to his or her reputation in order to recover.  
Dunlap
, 298 Ill. App. 3d at 338.  

The trial court then determined Larson's statements were qualifiedly privileged. 

Parker contends Larson's letters of January 12 and January 13, 1998, defamed him by imputing to him (1) the commission of a criminal offense, i.e., "bid rigging," and (2) the inability to perform or want of integrity in the discharge of duties of office or employment.  

Larson replies the challenged statements in her letters are nondefamatory as a matter of law because they are capable of "innocent construction" and are "substantially true."  She also contends her statements are protected by a qualified privilege.  

Although "an otherwise defamatory statement is not actionable if made under a qualified privilege" (
Larson v. Decatur Memorial Hospital
, 236 Ill. App. 3d 796, 799, 602 N.E.2d 864 (1992)), we first consider whether the challenged statements in Larson's letters are nondefamatory as a matter of law.  We are obliged to decide this issue because Larson contends summary judgment should be affirmed on the grounds there was no defamation 
per
 
se
.  The issue has been fully briefed.

INNOCENT CONSTRUCTION

Even if a communication falls within one of the recognized 
per
 
se
 categories
, a court will not find the communication actionable if it is reasonably capable of an innocent construction.  
Bryson v. News America Publications, Inc.
, 174 Ill. 2d 77, 90, 672 N.E.2d 1207 (1996).  Under the innocent construction rule, we are required to consider a written or oral statement in context, giving the words, and their implications, their natural and obvious meaning.  
Bryson
, 174 Ill. 2d at 90.  Whether a communication is reasonably susceptible to an innocent interpretation is a question of law for the court to decide.  
Bryson
, 174 Ill. 2d at 90.

Larson contends the assertions "
the specification of the lighting is rigged
," "
It appears that he 
[(Parker)]
 has rigged the specifications so that only his relative can bid and win the job
," and "
Globetrotter’s Mr. Parker has violated his own specifications in rigging this bid
" (emphasis in original) are not actionable 
per
 
se
 because the word "rigged" may reasonably be innocently construed. 

Larson notes Webster's Ninth New Collegiate Dictionary includes a number of different definitions for the word "rigged," including "to manipulate or control."  Webster's Ninth New Collegiate Dictionary at 1015 (1983).  She argues that, because "rigged" may be considered synonymous with "to fix in advance for a desired result," the court must innocently construe the word "rigged" as something other than an accusation of a crime.

Bryson
 dispels the notion that the innocent construction rule applies whenever a word has more than one dictionary definition, one of which is not defamatory.  
Bryson
, 174 Ill. 2d at 93.  

In 
Bryson
, the plaintiff brought a defamation action against the author of an article that appeared in a magazine's "fiction" section, and against the publisher of that magazine, alleging the article defamed plaintiff by referring to and characterizing a character (who had plaintiff's last name) as a "slut," thereby implying the plaintiff was an "unchaste" individual.  
Bryson
, 174 Ill. 2d at 84-87.

The defendants claimed the assertion plaintiff was a "slut" was not actionable 
per
 
se
 because the word "slut" may reasonably be innocently construed as describing the plaintiff as a "bully," where the American Heritage Dictionary includes a number of different definitions for the word "slut," including "a slovenly, dirty woman," "a woman of loose morals," "prostitute," a "bold, brazen girl," or "a female dog."  
Bryson
, 174 Ill. 2d at 92-93.  

The supreme court held the innocent construction rule does not apply simply because allegedly defamatory words are "capable" of an innocent construction.  
Bryson
, 174 Ill. 2d at 93.  The court instructed that allegedly defamatory words are to be interpreted as they appear to be used and according to the idea they were intended to convey to the reasonable reader.  
Bryson
, 174 Ill. 2d at 93.  

Here, Larson made several statements in her letter accusing Parker of "rigging" the lighting specifications on the CCH project and the Northwestern Dyche stadium project for Mr. Baum.  The crime of "bid-rigging" is committed when a person 

"knowingly agrees with any person who is, or but for such agreement would be, a competitor of such person concerning any bid submitted or not submitted by such person or another to a unit of State or local government when with the intent that the bid submitted or not submitted will result in the award of a contract to such person or another and he either (1) provides such person or receives from another information concerning the price or other material term or terms of the bid which would otherwise not be disclosed to a competitor in an independent noncollusive submission of bids or (2) submits a bid that is of such a price or other material term or terms that he does not intend the bid to be accepted."  720 ILCS 5/33E-3 (West 1998).

We find a defamatory meaning was conveyed by Larson.  "A statement need not state the commission of a crime with the particularity of an indictment to qualify as defamatory 
per
 
se
."  
Van Horne
, 185 Ill. 2d at 308.  

Stavros v. Marrese
, No. 1--00--2706, slip op. at 7 (June 28, 2001), supports our conclusion.  In 
Stavros
, the plaintiff brought suit for defamation, alleging a letter written by the defendant, sent to the plaintiff's employer, contained a wrongful and malicious accusation the plaintiff committed "extortion" in connection with the issuance of a construction permit.  
Stavros
, No. 1--00--2706, slip op. at 1-2.  The court held the defendant's "letter's repeated references to extortion are defamatory 
per
 
se
 under the first category", i.e., words that impute the commission of a criminal offense.  
Stavros
, No. 1--00--2706, slip op. at 7.  

Of course, a criminal accusation is only one category of statement which can be considered defamatory 
per
 
se
.  The record could support a finding that Larson's letters impute Parker with "an inability to perform or want of integrity in the discharge of duties of office or employment."  
Van Horne
, 185 Ill. 2d at 307.  Larson accuses Parker of violating "
his own specifications in rigging this bid
" (emphasis in original) and "specifying jobs in this fashion in the past."  See 
Kumaran v. Brotman
, 247 Ill. App. 3d 216, 227, 617 N.E.2d 191 (1993) (defendant's statement that the plaintiff was "working a scam" was defamation 
per
 
se
 because it could impute plaintiff had committed a crime, and also the statement could prejudice him in his profession or trade).

We are not required to strain to find an unnatural but possibly innocent meaning for words where the defamatory meaning is far more reasonable.  See 
Bryson
, 174 Ill. 2d at 93.  Nor are we required to espouse a naivete unwarranted under the circumstances.  
Bryson
, 174 Ill. 2d at 93.  We reject Larson's contention the defamatory language at issue must be innocently construed as a matter of law.

SUBSTANTIAL TRUTH

Larson next contends the trial court's decision was proper because her statements were substantially true. 

An allegedly defamatory statement is not actionable if it is substantially true, even though it is not technically accurate in every detail.  
Cianci v. Pettibone Corp.
, 298 Ill. App. 3d 419, 424, 698 N.E.2d 674 (1998).  A defendant bears the burden of establishing the "substantial truth" of her assertions, which she can demonstrate by showing that the "gist" or "sting" of the defamatory material is true.  
Cianci
 298 Ill. App. 3d at 424. 

When determining the "gist" or "sting" of allegedly defamatory material, a trial court must "look at the highlight of the article, the pertinent angle of it, and not to items of secondary importance which are inoffensive details, immaterial to the truth of the defamatory statement."  
Gist v. Macon County Sheriff's Department
, 284 Ill. App. 3d 367, 370, 671 N.E.2d 1154 (1996).  

The defense of substantial truth normally is a jury question.  But, first, courts must ask whether a reasonable jury could find substantial truth has not been established.  If the answer is no, the question is one of law, subject to 
de
 
novo
 review.  
Cianci
, 298 Ill. App. 3d at 424.

Larson contends the essence of her letters was that Parker's lighting specifications failed in various ways to meet statutory guidelines and contractually mandated quality assurance and bid guidelines, thereby threatening the taxpayers' right to obtain quality products at the most competitive price available.  Larson's view was that these perceived deficiencies served to ensure "
that the specification of the lighting is rigged
" to favor Mr. Jeff Baum, Parker's brother-in-law.  (Emphasis in original.)

Parker replies Larson's contentions are not pertinent to the "angle" of her letter and are of secondary importance.  Parker contends Larson's argument focuses on inoffensive details immaterial to the truth of the allegedly defamatory statement.  Parker says, "It is clear that the 'highlight' of Larson's statements are her charges – which she herself highlighted in bold typeface in her letters – that Mr. Parker engaged in criminal and unethical conduct by rigging the lighting specifications in order to steer business to his relative and to companies owned by his relative.  The clear 'angle' is that Mr. Parker was engaging in nepotism, a most basic form of corruption."

We note there is no evidence of any family relationship between Baum and Parker, and no evidence "Mr. Parker also specified the bid so that only Mr. Baum could bid and win the" Northwestern Dyche Stadium project.  We also note there is evidence PMC is a company -- not just a name -- and Baum did not own part of PMC or arrange to buy fixtures for relabeling under the PMC name.

Although we review the grant of summary judgment strictly against the moving party, we cannot say as a matter of law Larson's statements in her two letters were either substantially true or false.  There is an obvious factual dispute.  That is,

Did Larson make false and defamatory statements about Parker "rigging" the lighting specification of a public project to give business to Baum?  

We find the answer to that question is a triable issue of material fact, allowing a jury to decide whether the "gist" or "sting" of Larson's statements was substantially true. 

QUALIFIED PRIVILEGE

We next consider the trial court's finding of privilege.  See 
Turner v. Fletcher
, 302 Ill. App. 3d 1051, 1055, 706 N.E.2d 514 (1999).
 

Illinois follows the Restatement (Second) of Torts (1977) in determining whether a qualified privilege should be recognized in a given situation.  
Kuwik v. Starmark Star Marketing & Administration, Inc.
, 156 Ill. 2d 16, 24-29, 619 N.E.2d 129 (1993), citing Restatement (Second) of Torts §§ 593 through 599 (1977).  In 
Kuwik
, our supreme court recognized three classes of qualified privilege: (1) situations in which some interest of the person who publishes the defamatory matter is involved; (2) situations in which some interest of the person to whom the matter is published or of some other third person is involved; and (3) situations in which a recognized interest of the public is concerned.  156 Ill. 2d at 29. 

Parker contends Larson failed to prove the existence of a qualified privilege.  Although Larson has the burden of proving whether a conditional privilege for an alleged defamation statement exists, we look only to the occasion itself, and determine as a matter of law and general policy whether the occasion created a recognized duty or interest that makes the communication privileged.  
Kuwik
, 156 Ill. 2d at 24; 
Larson
, 236 Ill. App. 3d at 802. 

Our inquiry is a general one, requiring us to weigh the value of the type of interest to be protected against the degree of damage to be expected from release of the type of defamatory matter involved.  
Kuwik
, 156 Ill. 2d at 28.  "The qualified privilege, in particular, effectuates the policy of facilitating a free flow of information so that correct information may ultimately be attained."  
Kuwik
, 156 Ill. 2d at 24.  

In 
Kuwik
, the plaintiff/chiropractor's bill was submitted to the defendant insurance administrator for payment.  
Kuwik
, 156 Ill. 2d at 21-23.  In response, the plaintiff received a letter from the defendant stating the services the plaintiff rendered were "outside the scope of the practicing physician's license[]" and payment was therefore denied.  In fact, the treatment rendered was not outside the scope of the plaintiff's license.  
Kuwik
, 156 Ill. 2d at 19-20.  Because the bill also was submitted by the plaintiff's patient, the defendant's response letter was communicated to the patient.  The patient showed the letter to the plaintiff, and the plaintiff brought suit for defamation 
per
 
se
 against the defendant.  
Kuwik
, 156 Ill. 2d at 20-22.

The 
court found the letters were subject to a qualified or conditional privilege.  
Kuwik
, 156 Ill. 2d at 29.  It concluded the defendants and third parties all had a compelling interest in knowing whether the plaintiff was acting within the scope of her license.  
Kuwik
, 156 Ill. 2d at 29.

Because the letters in 
Kuwik
 were sent on occasions where not only the interests of defendants, i.e., insurance carriers and their employees, were involved, but where plaintiff's and the patient/claimant's interests were involved as well, "a misstatement of information should be afforded some degree of protection in order to facilitate the free flow of correct information."  
Kuwik
, 156 Ill. 2d at 30. 

In accord with 
Kuwik
, and consistent with the trial court's ruling, we find Larson's letters involve an interest of social importance -- fair bidding on a public project.  The interest is important enough to receive direct legal protection.  See 720 ILCS 5/33E-3 (West 1998).  It is protected by the privilege as described in 
Kuwik
.  See Restatement (Second) of Torts § 594, Comment d, (1977).  Cf.  
Vicker
, 308 Ill. App. 3d at 402 ("There is a definite general public interest in eradicating sexual harassment in the workplace").

We hold the trial court correctly concluded Larson's communications were conditionally privileged because Larson's "misstatement of information should be afforded some degree of protection in order to facilitate the free flow of correct information."  
Kuwik
, 156 Ill. 2d at 30.  Cf.  
Turner v. Fletcher
, 302 Ill. App. 3d 1051, 1055, 706 N.E.2d 514 (1999) ("An effective process for evaluating fitness of police officers is essential to ensuring public safety and maintaining a reliable, responsible police force").

ABUSE OF THE QUALIFIED PRIVILEGE

Parker contends the question of whether Larson abused her privilege was a question of fact for the jury to decide, not for the trial court.  We agree.

Once a defendant has established a qualified privilege, a communication is actionable only if the plaintiff can show the defendant abused the privilege.  
Vickers
, 308 Ill. App. 3d at 404.  To satisfy this burden, the plaintiff must present evidence of a "reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties."  
Kuwik
, 156 Ill. 2d at 30.  

The issue of whether a privilege was abused ordinarily is a question of fact.  
Vickers
, 308 Ill. App. 3d at 404.  The plaintiff must come forward with actual evidence creating an issue of fact.  
Cianci
, 298 Ill. App. 3d at 426.  

In 
Kuwik
, the court, after holding defendant's communications were conditionally privileged, found a genuine issue of material fact existed where the plaintiff offered evidence of the defendant's recklessness.  
Kuwik
, 156 Ill. 2d at 31.  At a deposition, one of the defendant's employees testified that company policy required input from both the legal and medical departments when investigating physician licensing.  Additional evidence established that only the legal department was consulted on this particular matter.  As a result, the court determined a question of fact existed as to whether the defendant was reckless because company investigatory procedures clearly were not followed.

The questions here are (1) whether Larson recklessly failed to conduct a proper investigation into whether Parker had participated in "bid-rigging" and "nepotism" before making those statements, and (2) whether she sent her letters to the proper parties, i.e., Nanci Wright, Tom Drzich, Jim Konnerth, or Pam Zekman.

Parker asserts Larson "acted maliciously by recklessly disregarding the truth of her defamatory statements" and acted with intent to harm him because she was motivated by greed, wanting to drive him off the CCH Project so bidding would open up.  The crux of Parker's contention is that Larson wrote and published her statements in the two letters with "actual malice" because she wrote what she wrote based on gratuitous gossip maliciously conjured up, and not as the result of a thorough investigation.

Parker is correct to point out that the important issue in a defamation suit is whether Larson's investigation was so deficient that it was conducted in reckless disregard of plaintiff's rights.  See 
Stavros
, No. 1--00--2706, slip op. at 10 ("It is possible that a finder of fact would determine that defendant should have investigated more carefully 'the matter,' i.e., the definition of extortion, to determine whether plaintiff's behavior in fact amounted to this criminal behavior, prior to sending the letter to plaintiff's employer").

Larson suggests nothing in her investigation led her to disbelieve her assertions, or that the facts in her letter were incorrect.  When "determining whether factual issues exist for purposes of a summary judgment motion," we "must ignore personal conclusions, opinions and self-serving statements and consider only facts admissible in evidence."  
Vickers
, 308 Ill. App. 3d at 407, quoting 
Reuben H. Donnelley Corp. v. Krasny Supply Co.
, 227 Ill. App. 3d 414, 421, 592 N.E.2d 8 (1991).

Before January 12, 1998, Larson had no personal experience with Parker on the CCH project or any other project.  In addition, other than the lighting specifications themselves, Larson did not review any other public documents concerning the CCH project.  Nor did she attend any of the public meetings discussing the specifications and the bid process for the CCH project.  To get Holcor products into the CCH project, Larson asked her sales representative, Jim Konnerth, to ask Parker to dinner -- an invitation Parker declined.  

Konnerth’s attempts to present Parker with Holcor materials on behalf of Larson failed.  Larson never made any attempts of her own to contact Globetrotters or Parker, or present them with materials concerning Holcor products.  

Larson and Konnerth had several conversations concerning their inability to get Holcor listed as a manufacturer in Parker’s lighting specifications.  Their conversations led Larson to several conclusions, some of which were: (1) Parker and Baum had a "special relationship" of some kind -- she was not sure if they were related; (2) Baum’s products were being specified and used to "an unusual degree on [Parker’s] projects" and it was "obvious the [CCH] specifications favored Jeff Baum"; (3) there were rumors in the industry "indicating that some manufacturers or some representatives don’t even want to bid on Parker’s projects because they believe that have very little chance, if any, of getting that project" before January 1998; (4) it was unfair that companies who did not meet Globetrotters’ specifications were listed in Parker’s specifications, and these were companies that had some sort of affiliation, relationship, or possible ownership with Baum, which she thought was "suspect"; and (5) although PMC and Lexes were listed as manufacturers on Parker’s specifications, they were not manufacturers -- suggesting that because PMC and Lexes were affiliated with Baum, Parker overlooked the fact that PMC and Lexes bought fixtures from other companies and relabeled them as their own.

Larson wanted support for her conclusions, so she started to investigate Parker.  Larson spoke to Nanci Wright, who testified that during some "friendly chit-chat, gossip" she told Larson it was a "rumor" that Parker and Baum were related.  Although Larson performed an internet search which was inconclusive, Larson believed Parker and Baum were brothers-in-law and never called Parker or Baum to verify the truth of their rumored relationship.

Similarly, Larson believed Parker had a history of favoring Baum on lighting specifications because Tom Drzich, Nanci Wright, Mike MacInerney, Paul DiTomo, and Jim Konnerth told her Parker did.  All of these people deny or cannot recall telling Larson that Parker had a history of favoring Baum.  In fact, several people she claims provided her with information concerning Parker’s allegedly improper conduct disagreed with Larson’s assertion Parker had "rigged" the lighting specifications or otherwise acted improperly in drafting the CCH and Northwestern Dyche Stadium lighting specifications.

Most significantly, after Larson believed she found support for all her allegations against Parker, she had several conversations with Mullin regarding her concerns Parker "rigged" the CCH lighting specifications to favor Baum.  Larson asked Mullin of Turner Construction to follow up on her investigation.  He did.  

Mullin and members of his staff conducted a review of the specifications and concluded there was no evidence of impropriety or noncompetitiveness in Parker’s lighting specifications.  Before Larson’s January 12, 1998, letter was written, Mullin telephoned Larson and told her that her allegations against Parker were "unfounded" and representatives other than Baum could competitively bid the project.

Larson wrote her letters anyway, accusing Parker of "rigging" the lighting specifications of the CCH project in favor of Baum because they were brothers-in-law.  She sent copies of one or both of the letters to people other than those named as recipients on the letters (e.g., Pam Zekman, a reporter for WBBM-TV in Chicago, Nanci Wright, Tom Drzich, and Jim Konnerth).  The contents of the letters became public knowledge in the industry.

A jury could find Larson improperly relied on or communicated with other persons, and never conducted a careful investigation into the CCH Project before attributing criminal and reprehensible conduct to Parker in her two letters.  That is, a jury could find she was reckless and abused her qualified privilege.
  

Parker has raised a triable issue of fact with respect to whether Larson abused the conditional privilege which otherwise protects her letters.  We hold the trial court erred in granting the defendant's motion for summary judgment.  See 
Stavros
, No. 1--00--2706, slip op. at 10.

FALSE LIGHT INVASION OF PRIVACY

Parker contends Larson's motion for summary judgment on count II, alleging a cause of action for false light invasion of privacy, should not have been granted.  The trial court made no ruling with respect to this cause of action, other than to grant summary judgment on all counts.

The tort of false light invasion of privacy protects one's interest in being let alone from false publicity.  
Aroonsakul v. Shannon
, 279 Ill. App. 3d 345, 350, 664 N.E.2d 1094 (1996).  In a false-light claim, the plaintiff must prove (1) he was placed in a false light before the public as a result of the defendant's action; (2) the false light in which he was placed would be highly offensive to a reasonable person; and (3) the defendant acted with knowledge that the information he published was false or with reckless disregard for whether the information was true or false.  
Kurczaba v. Pollock
, 318 Ill. App. 3d 686, 696, 742 N.E.2d 425 (2000); 
Lovgren v. Citizens First National Bank
, 126 Ill. 2d 411, 534 N.E.2d 987 (1989).

In cases where both defamation and false light claims are applicable, the plaintiff can proceed under either theory, or both, although there is only one recovery for each instance of publicity.  
Kurczaba
, 318 Ill. App. 3d at 695-97.

Here, the trial court dismissed Parker's count alleging false light invasion of privacy, apparently because "on this record and with respect to both the question of qualified privilege and the failure to present evidence of reckless conduct, there are no genuine issues of fact in dispute and the defendants are entitled to the judgment of dismissal sought as a matter of law."

Having found Parker raised a triable issue of fact with respect to whether Larson's letters are substantially true and whether she abused her conditional privilege, we find whether Larson knew her information was false or acted with reckless disregard for the truth are issues of fact for the jury.

CONCLUSION

We reverse the trial court's grant of summary judgment, and remand this matter for further proceedings.

Reverse and remanded.

HALL, P.J., and CERDA, J., concur.