In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-4092

CHERRY HAYWOOD,

*Plaintiff-Appellant,*

*v.*

LUCENT TECHNOLOGIES, INCORPORATED,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 4445—**James H. Alesia**, *Judge.*

ARGUED SEPTEMBER 6, 2002—DECIDED MARCH 20, 2003

Before POSNER, EASTERBROOK, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Cherry Haywood, an African American woman who worked for some time at Lucent Technologies as an engineer, had consistently unfavorable performance reviews. After a tense encounter with a supervisor, Lucent fired her. Convinced that it had done so for racially discriminatory reasons and in retaliation for an earlier complaint, Haywood sued Lucent under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* To these federal claims, she added a supplemental state law claim for defamation. The district court granted summary judgment in favor of Lucent on all counts. We affirm.

**I**

Haywood began working for Lucent in 1996. In December 1997, after various assignments, she transferred to the company's Switching and Access Systems (SAS) organization. In July 1998, Haywood received her mid-year performance review, which was generally unfavorable. Haywood, who felt that the problem was really management and not her performance, responded by filing an internal complaint of race discrimination with Lucent's Equal Opportunity/Affirmative Action (EO/AA) organization. Yolanda Escalante, an employee of the EO/AA organization, investigated Haywood's complaint and found no evidence of race discrimination. Nevertheless, Escalante suggested that management had not adequately defined Haywood's objectives, nor had it sufficiently documented its concerns about Haywood's performance. At her recommendation, management gave Haywood a satisfactory year-end performance rating for 1998 and agreed to help Haywood transfer to another department.

Thereafter, Haywood contacted Spencer Foote, an African-American senior manager in Lucent's Wireless organization, hoping to pursue opportunities in his organization. When Foote interviewed Haywood in December 1998, she told him about her earlier EO/AA complaint. Foote continued the hiring process, and in January 1999 he offered her a position as a project engineer. Haywood accepted. Once again, however, in May 1999, she received a generally unfavorable performance review, this time from Darlene Scott, her manager in the Wireless group. Scott appraised Haywood's performance based on a list of 19 job objectives Haywood had received at the beginning of the year. Although the evaluation attempted to be kind, praising Haywood for her contributions to Lucent's recruiting efforts, it was generally critical. Scott's evaluation reported a number of problems, including that Haywood (1) did not take personal responsibility for results and

usually deflected failure toward others; (2) did not assume accountability and responsibility; (3) received feedback on her behaviors and interaction with team members in a way that caused concern; (4) was not "proactive" in providing information on her project; (5) inconsistently met obligations, sometimes missing deadlines; and (6) did not regularly submit time reports. Scott also prepared a detailed, five-page, single-spaced memorandum listing specific examples of these problems. In a meeting with Scott, Foote, and the department's human resource manager, Melinda Jackson Douglas, Haywood was not receptive to management's feedback. Instead, she attacked Scott's evaluation of her performance, calling it subjective and defamatory. Haywood promised to prepare a rebuttal to Scott's evaluation, but she never provided any such document to her managers.

Around the beginning of July 1999, for reasons unrelated to this litigation, Lucent decided to disband Scott's group and allow project engineers to find work in other groups within Foote's organization. After some controversy over an alleged delay, Haywood was transferred to Robert Shuman's group in early August.

In November 1999, the pattern of unfavorable reviews continued. Shuman prepared Haywood's end-of-year performance review based on his own assessment of her work and feedback from Haywood's prior managers and peers that year. His evaluation was negative: on a scale of one to six (with six indicating the likelihood of termination), Shuman gave Haywood a rating of "five." A "five" meant that Haywood would not be terminated, but placed on a performance improvement plan. Haywood thought that Shuman's assessment was wrong.

In the end, however, another incident intervened that led to Haywood's termination. On December 2, 1999, she was called to Shuman's office to discuss the status of one

of her projects. Although the facts surrounding this incident are in dispute, and we would normally accept the facts most favorable to Haywood, in this instance it is important to recount both versions, because both versions reached the ultimate decisionmaker—Foote. According to Haywood, Shuman told Haywood that he felt she did not put in the aggressive work he expected. When Haywood responded that she did not understand, Shuman became agitated and said, "Cherry, I think you don't understand how much stress and pressure I am under here." Haywood responded, "Well, Bob, you know, I really feel sorry for a person who allows their moral values and ethics to be compromised if that is how you feel." Shuman ordered Haywood to "get the hell out of his office" and told Haywood he never wanted to see her again without a third person present. Shuman then rose from his chair, came over to where Haywood was standing, took her by the elbow, and pushed her out of the doorway.

Shuman's account is quite different. He recalled that Haywood was upset that he had questioned her progress on a project. She attacked him personally, telling him that he was a bad supervisor, that she did not respect him, and that he thought he was God. After this outburst, Shuman ended the discussion and told Haywood that he wanted to have a third party present at any further discussions because of his concern that Haywood would misrepresent him. He asked Haywood to leave the office, at which point she "stood her ground and proceeded to stick her finger in [his] face, escalating her tone." Shuman raised his voice, stood up, opened the door, and asked her to leave.

Both Shuman and Haywood e-mailed Foote, documenting their versions of the incident. In Haywood's e-mail, Haywood acknowledged that she had raised her voice in response to Shuman's statements "attacking [her] credibility." Foote apparently chose to believe Shuman's version of

the facts. After meeting with legal counsel, he terminated Haywood on December 7, 1999, for (1) her inability to accept and act upon constructive feedback; (2) her inability to "establish a viable working relationship with management"; and (3) her "pattern of insubordinate behavior."

On January 10, 2000, Haywood filed a complaint with the Equal Employment Opportunity Commission (EEOC), which issued Haywood a right-to-sue letter. This lawsuit followed on July 21, 2000.

## II

We review the district court's grant of summary judgment *de novo*, examining the facts in a light most favorable to Haywood as the nonmoving party, and drawing all reasonable inferences in her favor. *Greer v. Board of Educ. of City of Chicago*, 267 F.3d 723, 726 (7th Cir. 2001). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### A. Race Discrimination Claim

A claim of race discrimination may be established in one of two ways—under the direct method or the indirect burden-shifting method set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). See *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir. 1997). Under the direct method, the plaintiff may show either through direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose, such as her race or national origin.

See *id.*; *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

Relying on *Troupe*, Haywood argues that there is direct evidence of discriminatory intent, which she claims can be proved by circumstantial evidence. She points first to various comments that Foote allegedly made to herself and others at Lucent in the summer of 1999—namely that Foote said he was tired of helping or putting his neck out for African-American women because all they did was complain. Haywood also claims that Foote had told one African-American co-worker to be careful about the company she kept: "As a black woman it's already more difficult of a challenge to help you, but if you are keeping bad company that will certainly not help you." Second, she claims that Lucent treated her less favorably than it did two white male employees who also received performance ratings of five on their year-end review. Lucent put the two white male employees on performance improvement plans; only Haywood was terminated.

Lucent begins by arguing that there should be a presumption of non-discrimination because Foote, who discharged Haywood, is also African-American. It is wrong; no such presumption exists, nor should one be created. To the contrary, the Supreme Court has explicitly rejected exactly this idea: "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." *Castaneda v. Partida*, 430 U.S. 482, 499 (1976); see also *Oncale v. Sundowner*, 523 U.S. 75, 78 (1998).

In the end, however, Lucent does not need any such presumption. As the district court found, Haywood's circumstantial evidence is far too remote and insubstantial to permit a rational trier of fact to find direct discrimina-

tion. Even if one believed, consistently with Haywood's account, that Foote made the alleged comments in the summer of 1999, those comments were not made contemporaneously with or in reference to Haywood's termination in December 1999. *Gorence v. Eagle Food Ctrs.*, 242 F.3d 759, 762 (7th Cir. 2001) ("[B]igotry, per se, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action."); see also *Pafford v. Herman*, 148 F.3d 658, 666 (7th Cir. 1998). They are too remote to provide the link Haywood needs for a "direct evidence" case.

The only other evidence to which Haywood points is Lucent's allegedly more favorable treatment of the two white employees who received similar performance ratings. If Foote had cited Haywood's performance ratings as the reason for the termination, this might require further exploration. But he did not. He said that he was terminating Haywood because of her inability to accept and act on feedback, her problematic relationship with management, and her pattern of insubordination. Haywood has not pointed to evidence showing that the other two employees had a comparable set of failings, and thus no inference can be drawn from the fact that they were given another chance and she was not. See, *e.g.*, *Jones v. Union Pacific R.R. Co.*, 302 F.3d 735, 745 (7th Cir. 2002) (rejecting a similar "unusable comparison").

Haywood's discrimination claim fares no better under the *McDonnell Douglas* paradigm. As the plaintiff, she had the burden of establishing a *prima facie* case of race discrimination. To do so, she had to show that: (1) she was a member of a protected class; (2) she was meeting her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated

more favorably. 411 U.S. at 802; *Wells v. Unisource World-wide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002).

The district court found that Haywood failed to show that she was meeting her employer's legitimate job expectations (element 2). We agree. Haywood consistently received unfavorable performance reviews throughout her time at Lucent. The fact that she believes these evaluations were unwarranted is not enough to carry the day for her. In fact, she has pointed to nothing that tends to negate these assessments and show that her work was acceptable. At most, Haywood claims that a performance rating of "five" did not mandate termination. Perhaps not. But, as we just noted, this was not the only reason why she was terminated. Haywood has not met her burden of showing that she was meeting Lucent's legitimate job expectations at the time of her termination, *Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 745 (7th Cir. 2001), and that dooms her claim. She did not establish a *prima facie* case of race discrimination, and thus it is unnecessary for us to reach the issue of pretext.

### B.  Retaliation

Haywood also claims that she was a victim of unlawful retaliation, claiming that she suffered adverse employment action as a result of filing an internal complaint of race discrimination. In assessing this part of her case, we follow the standards for retaliation claims announced in *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640 (7th Cir. 2002).

The plaintiff may establish a *prima facie* case of retaliation in one of two ways. First, she may present direct evidence of a statutorily protected activity, an adverse employment action, and a causal connection between the two. *Id.* at 644. If her evidence is contradicted, the case

must be tried unless the defendant presents unrebutted evidence that it would have taken the adverse employment action against the plaintiff anyway, "in which event the defendant's retaliatory motive, even if unchallenged, was not a but-for cause of the plaintiff's harm." *Id.* at 642; see also *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 (1989).

The second is the indirect method, our "adaptation of *McDonnell Douglas* to the retaliation context." *Stone*, 281 F.3d at 644. At the first stage, the plaintiff must show that (1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id.* at 644; *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 466 (7th Cir. 2002). Under this method, the "plaintiff so proceeding need not show even an attenuated causal link," *Stone*, 281 F.3d at 644. If the plaintiff establishes these elements, the burden shifts to the defendant to come forward with a legitimate, non-invidious reason for the adverse employment action. *Id.* Although the burden of production shifts to the defendant under this method, "the burden of persuasion rests at all times on the plaintiff." *Klein v. Trustees of Indiana Univ.*, 766 F.2d 275, 280 (7th Cir. 1985). Once the defendant presents a legitimate, non-invidious reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual. *Id.*

Haywood claims that in retaliation for filing her EO/AA complaint of race discrimination, she was subjected to a number of adverse employment actions, including (1) negative performance reviews in May and November 1999, (2) an alleged transfer delay in July 1999, and (3) termination in December 1999.

While Haywood's termination certainly qualifies as an adverse employment action, see *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 135 (7th Cir. 1993), Lucent's other employment actions do not. We consider first the delay in her transfer. As we have said before, mere unhappiness and inconvenience are not actionable under Title VII. See *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). At minimum, the employee must be able to show a quantitative or qualitative change in the terms or conditions of employment. See *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 753 (7th Cir. 2002). The alleged one-month delay in Haywood's transfer was neither sort of change. Her duties, responsibilities, compensation, and benefits remained the same during this period, and Haywood does not allege that the delay affected her opportunities at Lucent or otherwise injured her career. See, *e.g.*, *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002). The uncertainty she experienced while waiting for her transfer may have been unpleasant, but it was not severe enough to constitute an adverse employment action.

As for the negative performance evaluations, it is well established that these alone do not constitute an adverse employment action. *Hilt-Dyson*, 282 F.3d at 466; *Grube v. Lau Indus.*, 257 F.3d 723, 729 (7th Cir. 2001); *Sweeney v. West,* 149 F.3d 550, 556 (7th Cir. 1998). They may be presented as evidence of discrimination, *Smart*, 89 F.3d at 442, or as evidence at the pretext stage to suggest that defendant's legitimate reasons for the plaintiff's termination are unworthy of belief or somehow tainted, *Giacoletto v. Amax Zinc Co., Inc.*, 954 F.2d 424, 427 (7th Cir. 1992). Haywood has nothing, however, to suggest that they are anything but genuine evaluations. In the end, it does not matter, because her termination suffices to satisfy her burden of demonstrating an adverse employment action. See *Crady*, 993 F.2d at 35.

That is of little avail to Haywood, however, because we agree with the district court that she has not established a causal link between her termination and her internal complaint of race discrimination. After Haywood informed Foote about her complaint against her former SAS organization, Foote offered Haywood the opportunity for a fresh start in his organization. Other than "pure speculation" that Foote was actually lying in wait for the opportunity to punish Haywood for having filed a complaint of race discrimination against a completely different group of people at Lucent, Haywood provides nothing to establish causation. *Lalvani v. Cook County*, 269 F.3d 785, 791 (7th Cir. 2001). Haywood was not terminated until a year after she informed Foote that she filed the complaint. This time period is far too long—at least on this record—to allow a reasonable fact-finder to infer that her termination was causally related to the filing of her complaint. See *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390 (7th Cir. 1999) (four months negates causal inference); *Davidson v. Midelfort Clinic*, 133 F.3d 499 (7th Cir. 1998) (no causal inference where employee was terminated five months after filing EEOC complaint). While "temporal proximity is only evidence of causation, not a separate element of the prima facie case," here Haywood fails to bring forth any evidence that her termination was related to her complaint. *Lalvani,* 269 F.3d at 791. Thus, Haywood's retaliation claim fails under the direct method.

Haywood's indirect case was also correctly rejected. As we noted earlier, Haywood has not alleged or shown that she was performing her job in a satisfactory manner. *Stone*, 281 F.3d at 644; *Hilt-Dyson*, 282 F.3d at 466. Summary judgment on the retaliation claim was proper.

## C. Defamation

The facts surrounding Haywood's slander claim are in dispute, but none of the disputes is material in the final

analysis. Haywood alleges that Scott, Shuman, and Foote told security that Haywood was unstable, and that if she appeared on company premises, security was to call the police. Haywood learned of these statements from Jacqueline McKinley, a security guard at Lucent, who learned of these statements from her superiors. Scott, Shuman, and Foote deny making any of these statements.

To prove defamation, Haywood must show (1) a false statement by Lucent, (2) an unprivileged publication of the defamatory statement, and (3) damages. *Parker v. House O'Lite Corp.*, 756 N.E.2d 286, 292 (Ill. App. Ct. 1999).

The problem with Haywood's claim is that she has not presented any admissible evidence of a defamatory statement. See *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) ("[E]vidence relied upon must be competent evidence of a type otherwise admissible at trial."). The only evidence she offers is her own testimony that another employee told her about information received from the employee's superiors in corporate security. This is inadmissible hearsay on multiple levels and is "not enough to preclude summary judgment." *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001). Although statements by Haywood's managers might constitute non-hearsay admissions on behalf of Lucent, Haywood's own version of the statements—based on another employee's version of the statements, which is based on the employees' superiors' version of the statements—is not admissible and will not overcome a motion for summary judgment. See *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

Moreover, an otherwise defamatory statement may not be actionable if a qualified privilege exists. See *Parker*, 756 N.E.2d at 297. Illinois common law protects "honest communications of misinformation in certain favored circumstances in order to facilitate the availability of

correct information." *Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 619 N.E.2d 129, 133 (Ill. 1993). A court must determine as a matter of law and general policy whether the occasion created a "recognized duty or interest that makes the communication privileged." *Parker*, 756 N.E.2d at 297. The inquiry is a general one, requiring the court to "weigh the value of the type of interest to be protected against the degree of damage to be expected from release of the type of defamatory matter involved." *Id*.

The district court held that Lucent had a compelling interest to make sure terminated employees were no longer allowed on company premises. Haywood presented no evidence tending to show that the company had no such interest, nor did she support a claim that Lucent had abused this privilege. See *Kuwik,* 619 N.E.2d at 133. We therefore affirm the district court's holding that the communications were covered by this qualified privilege.

### III

For the preceding reasons, the judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*