# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-1767

GLOBAL RELIEF FOUNDATION, INCORPORATED,

*Plaintiff-Appellant*,

v.

NEW YORK TIMES COMPANY, ASSOCIATED
PRESS, AMERICAN BROADCASTING COMPANIES,
INCORPORATED, et al.,

*Defendants-Appellees*.

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 01 C 8821—**David H. Coar**, *Judge*.

———————

ARGUED SEPTEMBER 22, 2003—DECIDED DECEMBER 1, 2004

———————

Before ROVNER, EVANS and WILLIAMS, *Circuit Judges*.

ROVNER, *Circuit Judge*. In the months following the September 11, 2001 terrorist attacks, journalists and news agencies published reports concerning the government's efforts to cut off all sources of funding for terrorist activities. The defendants here reported that Global Relief Foundation was one of the targets of government investigations into sources of funding for terrorism. Global Relief Foundation sued the defendants for defamation, complaining that contributions to the organization evaporated fol-

lowing these reports. Truth is an absolute bar to recovery for defamation and the district court granted summary judgment in favor of the defendants after finding that each of the reports was substantially true. We affirm.

## I.

The plaintiff, Global Relief Foundation, Inc. ("GRF"), was incorporated in Illinois as a charitable organization. The defendants are all reporters or news organizations. They include the New York Times Company (the "Times"), American Broadcasting Companies, Inc. ("ABC"), Globe Newspaper Company a/k/a The Boston Globe (the "Globe"), Associated Press, Inc. (the "AP"), Daily News, L.P. ("DNLP"), Hearst Communications, Inc. ("Hearst"), Antonio Mora ("Mora"), Martha Mendoza ("Mendoza"), Judith Miller ("Miller"), Kurt Eichenwald ("Eichenwald"), William Louis (Zev) Chafets ("Chafets"), Scott Winokur ("Winokur") and Christian Berthelsen ("Berthelsen").

In the days following September 11, 2001, the U.S. government sought to identify the persons and organizations responsible for the attacks. President George W. Bush announced that the United States would make no distinction between those "who committed these acts and those who harbor them." By September 15, President Bush publicly identified Osama bin Laden and the al Qaeda organization as the main suspects in the attacks. A few days later, the President stated that the United States would also focus on non-governmental organizations which served as fronts or as funding mechanisms for terrorist organizations. On September 23, 2001, President Bush implemented Executive Order 13224, declaring a national emergency to deal with the threat of terrorist attacks and specifically authorizing the government to freeze the assets of people and organizations that supported or were associated with terrorism. Each of the defendants subsequently reported on the gov-

ernment's investigations into organizations linked to terrorism. Because these reports form the bases of the libel claims, we will detail each report as it relates to GRF.

### A.

The first report came the day after the Executive Order was issued. ABC broadcast a report by Antonio Mora on its "Good Morning America" program, detailing the government's actions in freezing the U.S.-held assets of "charities and non-governmental organizations in the U.S. and abroad that funnel money to bin Laden and other terrorists." Mora noted that the president had issued an executive order to follow through on his promise to cut off funds to terrorists. He stated, in relevant part:

> Now, a few of the charities accused of getting funds to bin Laden have operations here in the U.S. They're listed there. The Holy Land Foundation out of Richardson, Texas; The Islamic Relief Agency out of Colombia, Missouri; Global Relief Foundation out of Bridgeview, Illinois, and the Al Kifah Refugee Center in Brooklyn.

> Now, most deny the charges. Now, there are dozens of others abroad that are listed as terrorist fronts, too. So, Charlie, it is the first punch in this financial war against terrorism.

Good Morning America, September 24, 2001, Transcript from Video Monitoring Services of America, L.P. Later in the day, ABC published a retraction on its website, reading:

> In an early report on President Bush's Executive Order to freeze assets around the world, Good Morning America said that certain U.S.-based charities (the Holy Land Foundation, the Islamic Relief Agency, the Global Relief Foundation, and the Al Kifah Refugee Center) had been accused of "getting funds to Bin Laden." This is not the case. We regret the error.

**B.**

The second report came in an article by Zev Chafets in the September 28, 2001 edition of the New York Daily News. The focus of the article was the Council on American-Islamic Relations ("CAIR"), a group the author states was "in bed with at least two philanthropic groups suspected of being fronts for one of the Middle East's most lethally anti-American, anti-Jewish jihadists: Palestinian Hamas." Chafets commented that although CAIR condemned the September 11 attacks, the group did not acknowledge that the attacks were connected to Osama bin Laden and that they were carried out in the name of an Islamic holy war:

> On the other hand, the CAIR is very specific about how the public should respond to the attacks on America: Send money. It recommends contributing to three organizations—the Red Cross, the Holy Land Foundation and the Global Relief Foundation. . . . The Global Relief Foundation, located in Bridge View [sic], Ill., has been accused by Israel and American security experts of funneling money and support to Hamas. Like the Holy Land Foundation, it is currently under intense federal scrutiny.

> CAIR is untroubled by these investigations. In fact, it regards these two organizations as victims of persecution. "There's been a campaign to shut them down for years," Hooper[1] says. "You tell me if they are legal American organizations."

> They are. For now.

> Bush is right to insist that not every Islamic and Arab group supports holy warriors such as Hamas. But, as his staff ought to know by now, some have, and still do.

---

[1] "Hooper" is Ibrahim Hooper, a spokesman for CAIR, who denied any connection between CAIR and Hamas earlier in the article.

"Beware the Wolves Among Us," New York Daily News, September 28, 2001, p. 30, Zev Chafets.

## C.

A few days later, the New York Times published the third report, focused on the "financial assault" against Osama bin Laden. During the prior week, the Bush administration had frozen the assets of twenty-seven individuals and organizations linked to bin Laden. The article reported that administration officials were preparing to freeze the assets of approximately two dozen more charities and other organizations "that are suspected of providing money and support to his terrorist operations." The article discussed individuals and organizations under investigation for ties to bin Laden:

> The new list of suspect organizations, now under review by a group of officials led by Treasury Department representatives, includes charities in Saudi Arabia and Chicago, an Arab bank and at least three "hawalas," the informal money-lending networks common in the Arab world. The list is expected to be announced within two weeks.

New York Times, "A Nation Challenged: The Investigation; U.S. Set to Widen Financial Assault," October 1, 2001, Judith Miller and Kurt Eichenwald (hereafter "Nation Challenged"). The article described the complex web of financing terrorists use for their activities, including ties to relief organizations that provide legitimate humanitarian services at the same time they support terrorism. After discussing the Benevolence International Foundation as a group being investigated for conducting both legitimate charitable work and terrorist support, the authors turned to GRF:

> Administration officials are also recommending that an American charity be included on the new list—the

Global Relief Foundation, which provides emergency relief, medical aid and engages in other humanitarian efforts around the world.

Global Relief, based in Bridgeview, Ill., long a hub of militant Islamic activity, is also making an appeal on its Web site for victims of the catastrophes at the World Trade Center and the Pentagon, though it does not refer to them as terrorist attacks.

Global Relief was originally included two years ago on a list circulated by the Clinton administration of 30 organizations with suspected ties to terrorism. But in an interview last year Stanley Cohen, a lawyer for Global Relief, called the investigations of the foundation "another of the government's pathetic attempts to sully committed Islamic organizations."

*Id.* These final three paragraphs of the lengthy article contain the only mention of GRF.

## D.

Martha Mendoza, an AP national reporter, authored the fourth report on GRF's list, an October 5, 2001 piece titled, "Islamic Aid Groups Scrutinized." As in the Nation Challenged article, Mendoza recounted the president's move to freeze the assets of twenty-seven people and organizations the prior week, and discussed future targets of the government's terrorist financing investigations. She described the government's investigation process of reviewing open source information and gathering data from the CIA, the FBI, foreign governments and the State Department to determine whether credible evidence existed to place a particular organization on the list:

Among U.S.-based relief organizations receiving close federal scrutiny are Benevolence International Foundation based in Worth, Ill.; Global Relief Foundation in

> Bridgeview, Ill.; and the Holy Land Foundation for Relief and Development in Richardson, Texas, according to two government sources involved in the investigation, who spoke on condition they not be identified. Those organizations may or may not be on the government's next list, the sources said.

Washington Post, "Islamic Aid Groups Scrutinized," October 5, 2001, Martha Mendoza, AP National Writer. After detailing denials of involvement with terrorism by both Holy Land Foundation and Benevolence International, Mendoza turned to GRF:

> Global Relief Foundation, which received about $4.9 million in contributions in 1999, is also working in the Afghanistan area, said spokesman Ashraf Nubani, an attorney in Springfield, Va.

> Nubani said his organization is being unfairly singled out because it is run by Muslims. But he said his group helps anyone in need.

> "GRF would have no problem in providing humanitarian assistance to a suicide bomber's family," he said. "They could become destitute after that act and may well need food or medicine. But that's a footnote to what we do, a worst case scenario."

> According to its promotional materials, Global Relief Foundation is a "humanitarian organization working to provide care, support and relief to people in need throughout the world" through medical aid, family assistance and scholarships.

*Id.*

Mendoza described the Islamic view of charitable giving and then detailed the problem of money earmarked for the needy finding its way to terrorist organizations. She cited a recommendation by the president of the National Committee for Responsive Philanthropy that potential donors should

conduct due diligence on organizations before giving, checking the local Better Business Bureau or online services such as guidestar.org that reviews charities. Mendoza commented, "No reports of terrorist involvement appear on guidestar's reviews of Benevolence International, Global Relief or the Holy Land Foundation." There were no other references to GRF in the article.

### E.

The fifth report was published in the Boston Globe on October 11, 2001. Staff reporter Mac Daniel explained that charity is an act of worship for Muslims. He used GRF as an example of an organization that encourages charitable giving through its website:

> Through these requests and the millions of dollars it has generated, however, Global Relief Foundation, based in Illinois, may also be a clandestine agent of terror, according to federal investigators.

> The GRF, which claims to be one of the world's largest Muslim humanitarian organizations, has been under federal scrutiny for some time. Two years ago, after the deadly bombings of two US embassies in East Africa, the group's name appeared on a federal list of 30 US charities and relief agencies with alleged ties to terrorism.

> The Bush administration last month froze the assets of 27 organizations allegedly tied to Osama bin Laden and various terrorist groups. Global Relief Foundation this week is expected to be added to an updated Treasury list of US charities and relief agencies with alleged ties to terrorism, government officials said. The expected action follows investigators' matching of the group to a database of 14 million questionable transactions in the United States and overseas.

> Adding to the group's mystery was the fleeing of its co-founder and former director, Hazem Ragab, last year after FBI agents tried to question him about his ties to a Texas mosque that helped raise funds for GRF, according to the Chicago Tribune.

Boston Globe, "Charity Probe: Muslim Relief Agency Eyed in Terror Link," October 11, 2001, Mac Daniel. Daniel then explained that although GRF claimed to fund humanitarian efforts, it could not account for funds sent overseas, totaling millions of dollars, and was vague in IRS filings regarding how the money was spent. The article included the views of GRF's lawyer, Ashraf Nubani:

> For Nubani, GRF is the innocent target of a nation enraged. He denied that the group's funds go to anything but humanitarian aid and said the organization has only been in "casual" contact with federal investigators.
>
> Nubani blamed the negative attention on GRF on "Zionist journalists" and others with anti-Muslim agendas.
>
> But in interviews over the past week, Nubani refused to name relief agencies that could vouch for GRF's work overseas. He did not allow access to GRF's full financial records despite numerous requests.

*Id.* Daniel concluded the report by pointing out that a number of legitimate international relief agencies were unfamiliar with GRF.

### F.

The sixth and final report was published by Hearst Communications on November 7, 2001. Scott Winokur and Christian Berthelsen reported on Bay Area donations to Chicago-area Muslim charities that were being investigated for "possible terrorist money-laundering activities." San Francisco Chronicle, "2 Muslim Charities Probed for Terror Link; Bay Donors Chip in to Chicago Groups," November 7, 2001, Scott Winokur & Christian Berthelsen. According to

the article, contributors claimed they thought the money was going to charitable uses and were surprised to learn some of their donations may have gone to support terrorism:

> Global Relief and the Benevolence International Foundation of Palos Hills, Ill., are two of the organizations the U.S. Treasury department is scrutinizing. As of Friday, the department had frozen the assets of 88 other individuals and organizations and is expected to add to the list again today, The Chronicle has learned.

*Id.* The authors described a man who gave $5200 to GRF after being presented with a list of charities at his mosque. He believed the money was used for the poor and said there had been no mention of the Taliban, bin Laden or al Qaeda. In a section titled, "Charities Say It Isn't True," the authors discuss denials and evidence:

> Benevolence International and Global Relief have denied roles in terrorist financing and condemned the Sept. 11 attacks on the World Trade Center and the Pentagon.

> According to a report in the Los Angeles Times on Sunday, however, the Treasury Department recently sent a confidential memorandum to state charity officials asking for information about eight Muslim groups in the United States, including Benevolence International and Global Relief.

> A Treasury spokeswoman, Tasia Scolinas, declined to comment on the memo or on charitable groups that may be named in future seizures.

> However, a spokesman for the Texas attorney general confirmed yesterday that his office did receive such a communication.

> Rita Katz, a security consultant in Washington, D.C., who specializes in charitable organizations suspected of

> serving as terrorist fronts, said donors to Benevolence International and Global Relief get only part of the truth about the ways their contributions are used.
>
> "They won't tell you the money is going to Hamas," Katz said, referring to the principal Palestinian terrorist organization. "They will tell you the money is going to humanitarian activities, which isn't wrong; they do give money to humanitarian organizations as well. But their fund-raising literature says nothing about al Qaeda or jihad."

*Id.*

After describing an individual who stopped giving to Benevolence International, the article reported that GRF raised nearly $5 million in 1999:

> It describes its mission as the provision of economic, occupational and agricultural aid, with an emphasis on Bosnia and Chechnya.
>
> A spokesman for Global Relief, Asim Ghafoor, said the foundation has contacted both the Office of Foreign Asset Control and the National Security Counsel for confirmation of reports that its assets eventually could be seized.
>
> He said it hasn't gotten any response from the government.
>
> "They (reporters) told us there was reason to believe we were being investigated," but the foundation hadn't received "even a knock on the door" from federal authorities, he said.
>
> Ashraf Nubani, a Springfield, Va., attorney for Global Relief, attributed reports naming the organization to "anti-Muslim hysteria" and the "Israel-can-do-no-wrong lobby."

*Id.* There were no further mentions of GRF in the article.

## II.

On November 15, 2001, GRF filed its diversity complaint in the district court, alleging defamation in each of the reports detailed above. Approximately one month later, on December 14, 2001, the Office of Foreign Assets Control ("OFAC") blocked the assets of GRF pending investigation. *See* http://www.treas.gov/offices/enforcement/ofac/actions/20011214a.shtml. GRF was notified of the blocking order in a letter from OFAC on that same day stating:

> The United States Government has reason to believe that Global Relief Foundation Inc. ("GRFI") may be engaged in activities that violate the International Emergency Economic Powers Act, 50 U.S.C. Sections 1701-06 ("IEEPA"). You are hereby notified that pursuant to the authorities granted by IEEPA, the U.S. Department of the Treasury is blocking all funds and accounts and business records in which GRFI has any interest, pending further investigation and resolution of this matter.

R. 114, Ex. A, at 20 n.12. On October 18, 2002, the Treasury Department designated GRF a "Specially Designated Global Terrorist." R. 114, Ex. D. "The term *specially designated global terrorist* or *SGDT* means any foreign person or person listed in the Annex or designated pursuant to Executive Order 13224 of September 23, 2001." 31 C.F.R. Part 594.310 (emphasis in original). As we discussed above, that Executive Order declared a national emergency to deal with the threat of terrorist attacks and authorized the government to freeze the assets of people and organizations that supported or were associated with terrorism. The list of persons designated pursuant to Executive Order 13224 has grown considerably since it was instituted. GRF now finds itself on the list in the company of Osama bin Laden, al Qaeda and Hamas along with hundreds of other individuals and organizations. GRF has challenged its designation in a

separate lawsuit. *See Global Relief Foundation, Inc. v. O'Neill*, 315 F.3d 748 (7th Cir. 2002), *cert. denied*, 124 S. Ct. 531 (2003).

GRF sued all of the reporters and news agencies involved in publishing the six reports we have detailed, contending that each report was false and defamatory. The defendants moved for summary judgment, contending that their statements regarding the investigation of GRF for terrorist ties are true. The district court noted that GRF offered nothing other than blanket denials of links to terrorism to refute the truth of the news reports. Under Illinois law, the court found, the defendants could prevail on summary judgment by demonstrating that the reports were substantially true, that is, that the gist or sting of the allegedly defamatory material was true. The court then analyzed each article to determine its "gist" or "sting." The court concluded that the gist of each article was that the government was investigating GRF for links to terrorism and was considering freezing the organization's assets. None of the reports stated that GRF was a terrorist organization or even was linked to a terrorist organization, only that the government was investigating GRF to determine if such links existed. The defendants produced affidavits from government sources confirming that the government was in fact investigating GRF for links to terrorist groups and was in fact contemplating freezing the organization's assets at the time the reports were made. The court thus found that the reports were substantially true and entered summary judgment in favor of the defendants. GRF appeals.

On appeal, GRF argues that the court erred in finding the reports were substantially true. GRF maintains that the defendants should be required to demonstrate not only that they accurately reported the government's suspicions but that GRF was actually guilty of the conduct for which the government was investigating the group. GRF states that it has never provided money or assistance to terrorists and

thus the reports were false and defamatory. GRF urges this court to find that the defenses of substantial truth, innocent construction and neutral reportage were not applicable here. GRF also complains that the district court should have consolidated this case with GRF's parallel action against the government to better enable GRF to complete discovery on the issue of the truth of the government's accusations. GRF contends the reports could not be innocently construed, and that GRF adequately pled defamation *per quod* when it alleged that the defendants accused the organization of giving aid to terrorists following September 11, 2001 and that GRF lost most of its donations following publication of these articles and reports.

Our review is *de novo. Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002); *Smith v. Severn*, 129 F.3d 419, 425 (7th Cir. 1997). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). We view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Smith*, 129 F.3d at 425. The non-moving party must make a showing sufficient to establish any essential element of its case for which the non-movant will bear the burden on persuasion at trial. *Smith*, 129 F.3d at 425. This means that GRF must show that there is more than mere metaphysical doubt as to the material facts. *Id.* The applicable substantive law will dictate which facts are material. *McGinn v. Burlington Northern R.R. Co.*, 102 F.3d 295, 298 (7th Cir. 1996). GRF has brought a state law defamation suit and we will therefore apply the substantive law of the state in which this diversity case was filed, in this case, Illinois. *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 634 (7th Cir. 2002) (a district court sitting in diversity must apply the law of the state in which it sits). Illinois law therefore determines which facts are material.

## A.

To prove a claim of defamation, a plaintiff must show that a defendant made a false statement concerning the plaintiff, that there was an unprivileged publication of the defamatory statement to a third party by the defendant, and that the plaintiff was damaged. *Dubinsky v. United Airlines Master Executive Council*, 708 N.E.2d 441, 446-47 (Ill. App. 1 Dist. 1999); *Cianci v. Pettibone Corp.*, 698 N.E.2d 674, 678 (Ill. App. 1 Dist. 1998). GRF has raised a genuine issue of material fact related to damages by showing that donations to the organization diminished after the publication of these statements. A statement is considered defamatory if it tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with that person. *Bryson v. News America Publications, Inc.*, 672 N.E.2d 1207, 1214 (Ill. 1996); *Dubinsky*, 708 N.E.2d at 446; Restatement (Second) of Torts, § 559 (1977). Again, there is no real argument about whether the statements at issue tended to harm the reputation of GRF in a way that deterred third parties from dealing with the group. The statements were issued in the immediate aftermath of the September 11, 2001 terrorist attacks, and revealed (in even their most innocuous reading) that the government was investigating GRF for possibly providing money to terrorists and was considering freezing the group's assets. On summary judgment, we must assume that allegations of a government investigation into funding of terrorism tended to harm the reputation of GRF in a way that deterred third parties from dealing with the group. The articles themselves, which quote persons who had donated to GRF or other charities in the past, are replete with evidence that donors had serious misgivings about the group on hearing of the government probe. GRF has produced sufficient evidence of publication; the statements appeared in prominent newspapers and on national television. The issues on summary judgment,

then, are whether the statements were false, whether the defendants had some privilege to publish them, and whether the defendants had any other defense that would entitle them to judgment as a matter of law.

The Supreme Court has held that when a private-figure plaintiff seeks damages against a media defendant for speech on matters of public concern, the plaintiff must bear the burden of showing that the speech at issue is false before recovering damages. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77 (1986). *See also Voyles v. Sandia Mortgage Corp.*, 751 N.E.2d 1126, 1133 (Ill. 2001) (falsity is an element of the plaintiff's defamation claim and plaintiff thus bears the burden of proof on falsity). Some of the Illinois cases frame truth as an affirmative defense that must be pled and proved by the defendant. *See, e.g., Cianci*, 698 N.E.2d at 678 (truth is a defense to a defamation action); *American Int'l Hosp. v. Chicago Tribune Co.*, 483 N.E.2d 965, 968 (Ill. App. 1 Dist. 1985) (same). We can reconcile this seeming conflict with the more frequently described defense of "substantial truth" discussed in the Illinois cases. *See Cianci*, 698 N.E.2d at 678-79; *Chicago Tribune*, 483 N.E.2d at 968; *Tunney v. American Broadcasting Co.*, 441 N.E.2d 86, 89 (Ill. App. 1 Dist. 1982); *Sivulich v. Howard Publications, Inc.*, 466 N.E.2d 1218, 1220 (Ill. App. 1 Dist. 1984). A plaintiff may be able to demonstrate, for example, that a statement is technically false in some way, meeting its burden of establishing that element of its case. In Illinois, a defendant may then defeat the claim by showing that the statement, although not technically true in every respect, was substantially true. *Tunney*, 441 N.E.2d at 89 (to establish truth as a defense to a defamation action, it is not necessary to establish the literal truth of inoffensive details). *See Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993) (the rule making substantial truth a complete defense and the constitutional limits on defamation suits coincide). To establish the defense of substantial

truth, the defendant need only show the truth of the "gist" or "sting" of the defamatory material. *Cianci*, 698 N.E.2d at 678-79; *Chicago Tribune*, 483 N.E.2d at 968; *Tunney*, 441 N.E.2d at 89; *Sivulich*, 466 N.E.2d at 1220. *See also Haynes*, 8 F.3d at 1227 (if the gist of a defamatory statement is substantially true, error in detail is not actionable). Bearing in mind that the plaintiff, in this case GRF, bears the burden of proof on the falsity of the statement, we turn to GRF's evidence in support of this element of the claims.

GRF seems to concede (at least for the purposes of summary judgment) that the government was in fact investigating the organization for financial ties to terrorism at the time the statements were published. GRF maintains, however, that the gravamen of the reports was not that the government was conducting an investigation but that GRF was actually involved in funding terrorist operations. GRF denies that it has ever funded terrorist operations and thus maintains that the reports were false. GRF characterizes the fact of the investigation as an "inoffensive detail" qualifying the true defamatory sting of the reports, that GRF was a front for terrorists, including al Qaeda.

In support of its claim that it does not and has never funded terrorism, GRF submitted two affidavits, one by Mohamad Chehade, the executive director of GRF, and the other by Roger Simmons, lead counsel for GRF in this case and in GRF's case against the government. Both of the affidavits were submitted first in GRF's case against the government. According to Chehade, GRF spends in excess of 80% of its income on charitable work and approximately 17% on administrative costs. Chehade states the group has supported clinics, trade schools and hospitals in twenty-two countries. He avers that GRF has delivered aid to those in need due to natural disasters such as earthquakes and drought, as well as to war-distressed refugees in Chechnya, Afghanistan, Bosnia and Kosovo. Chehade alleges that GRF

delivered food, medical supplies, tents and blankets to those in need throughout the world. He also states that in the entire history of GRF's existence, the group has never engaged in violence or supported violence, terrorism or military operations, and has never supplied weapons or military items to anyone. He also denied that GRF ever provided humanitarian aid to groups or organizations known to be engaged in violence. Finally, he denied that GRF has ever offered to provide humanitarian assistance to families of suicide bombers in advance of suicide attacks and stated it has never been GRF's policy to support suicide bombing directly or indirectly. Chehade's affidavit does not address the government's investigation into GRF except to acknowledge the December 14, 2001 blocking order and the government searches of GRF's offices and Chehade's personal residence that same day.

Simmons' affidavit focused not on GRF's evidence of the falsity of the statements but on the government's lack of proof of the truth of the allegations. Simmons stated that he had been prevented from taking discovery into the government's alleged investigation of GRF in the government's separate investigation. He complained that many of the documents the government did produce were redacted and many documents were withheld entirely. He also maintained he was prevented from taking the depositions of government agents who allegedly had personal knowledge of the government's investigation into GRF. Simmons stated that with discovery, he would be able to establish that the government had no evidence that GRF funneled money to bin Laden, al Qaeda or Hamas, and that the government had no evidence that ties GRF to any terrorists. Notably, he did not aver that the government did not investigate GRF for ties to terrorism or that GRF had no ties to terrorism, only that, with adequate discovery, he expected to find that the government had no evidence that GRF is tied to terrorism. Simmons' affidavit does little to demonstrate the falsity of the

reports. For the purposes of summary judgment, Chehade's affidavit demonstrates a genuine issue on whether GRF has ever funded terrorist activity. That genuine issue, however, may not be material or relevant if the true gist or sting of the publications was not that GRF funded terrorism but that the government was investigating GRF for ties to terrorism and was considering blocking the group's assets.

The defendants characterize the gist or sting of the articles from this latter perspective. According to the defendants, the gist of each report was that the government was investigating GRF for financial links to terrorism and was contemplating freezing the group's assets. The defendants have produced affidavits of two government agents, FBI Special Agent Brent Potter and OFAC Director Richard Newcomb, demonstrating that the government was in fact investigating GRF for links to terrorism at the time these reports were issued. Potter stated that since 1997 he had been assigned to investigate GRF for possible ties to terrorist organizations (including al Qaeda) and for possible support of terrorist activities. Although the affidavit is heavily redacted, Potter detailed some of the evidence the FBI collected tying GRF to terrorism. Potter revealed, for example, that GRF was in contact with Wadih el Hage, a man convicted in the 2001 trial related to the bombings of U.S. embassies in Kenya and Tanzania. El Hage had served as personal secretary to Osama bin Laden prior to moving to Kenya in 1994. While in Kenya, el Hage was in contact with bin Laden and his military commander, Muhammad Atef, and also was in contact with GRF's offices in Belgium and in Bridgeview, Illinois. According to Potter, GRF promotes the Islamic jihad movement against established governments in the Middle East and Asia. The FBI also came into possession of a copy of GRF's Arabic-language newsletter titled, "Global News" that encouraged giving to GRF so that the money could be spent "for God's cause (the Jihad)," and stated that the funds are disbursed for "equipping the raiders,

for the purchase of ammunition and food." According to the Global News, the most important disbursement of Zakat (the obligation of Muslims to donate 2.5% of their personal wealth to God) "is on the Jihad for God's cause." The FBI also recovered from GRF's dumpster photographs of sophisticated wireless communications equipment, including radio transceivers, HAM radio base sets, long range radio antennas, batteries, power packs, binoculars, ropes, saddles and tools. The model of radio portrayed in the photos was found in possession of an al Qaeda suspect under investigation in the embassy bombings, and was also used in a terrorist group assassination attempt on Egyptian President Hosnia Mubarak in 1995.

Newcomb's affidavit explains generally OFAC's responsibility in administering U.S. economic sanctions programs and IEEPA Executive Orders. As this duty relates to GRF, Newcomb explained that OFAC issued the December 14, 2001 blocking order pending its investigation of GRF:

> In making its determination, OFAC evaluated the various criteria set forth in E.O. 13224, with a primary focus on subsections 1(c) and 1(d)(I). Subsection (c) permits blocking where persons are determined "to be owned or controlled by, or to act for or on behalf of" persons within the scope of the order. Subsection 1(d)(i) is a basis for blocking where persons are determined to "assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of" the terrorists and terrorist activity falling within the scope of the order. OFAC considered both classified and unclassified information in reaching its decision to issue the blocking order.

R. 114, Ex. B, ¶ 34. According to Newcomb, since at least September 2001, "GRF has been the subject of investigations by Treasury and the FBI relating to links to international terrorist organizations and their activities. Based on

meetings I have attended and briefings I have received from my staff, it is my understanding that GRF's links to terrorist groups generally have been known within the intelligence and law enforcement communities dating back many years." R. 114, Ex. B, Annex, at ¶ 2.

In addition to these affidavits, the defendants also point to the December 14, 2001 blocking order that froze GRF's assets pending completion of the investigation and the subsequent Treasury Department designation of GRF as a Specially Designated Global Terrorist ("SDGT"). The defendants thus argue that they have proved the truth of their reports that the government was investigating GRF for links to terrorism and moreover have truthfully reported on the government's subsequent action in freezing those assets and designating GRF as a terrorist organization. The defendants argue that requiring the media to prove the actual and ultimate guilt of the subject of a government investigation would dramatically and improperly chill the ability of the press to report on the actions of government and would deny the public information about matters of vital public concern. We turn to the articles to determine whether GRF has shown the falsity of the reports, and to assess the gist or sting of each article.

### 1.

As with all of the other reports, Antonio Mora's statements about GRF were preceded by a report on the September 24, 2001 Executive Order. Mora accurately reported that the Order was expected to focus on charities and non-governmental organizations in the U.S. and abroad. Mora added that GRF was one of "a few of the charities accused of getting funds to bin Laden." He also repeated the accused groups' denials. At the time he made this statement, GRF had not been "accused of getting funds to bin Laden." The

group was being investigated for its financial ties to terror-
ists but had not yet been officially or publicly designated as
a terror financier by the government. In that sense, Mora's
report was not technically true. The gist or sting of the
report, however, was substantially true.[2] That is, the
government was investigating GRF for its ties to terrorism
and anticipated blocking GRF's assets and adding the org-
anization to the list of SDGTs. As it turned out, the only
inaccuracy of Mora's report was in the timing of the govern-
ment's official and public actions against GRF. GRF was not
named in the September 24, 2001 blocking order; it was
named on December 14, 2001, and then was designated a
SDGT in October 2002. Mora's report was prescient, not
inaccurate.

### 2.

In the September 28, 2001, New York Daily News article,
Chafets focused primarily on CAIR. He criticized CAIR for
being associated with two philanthropic groups suspected
of being fronts for Hamas. Subsequently, he described CAIR's
bid for donations to the Red Cross, GRF and the Holy Land
Foundation, stating that GRF has "been accused by Israel
and American security experts of funneling money and
support to Hamas," and that the group is "currently under
intense federal scrutiny." GRF, of course, was under intense
federal scrutiny at the time. Although GRF had not been
accused publicly of funneling money to Hamas, the group's
ties to terrorism were known for many years in the intelli-
gence and law enforcement communities according to the
director of OFAC. The question again was timing. In short

---

[2] Illinois law treats libel and slander alike and thus it is irrele-
vant that Mora's remarks were spoken and the statements of the
other defendants appeared in print. *Bryson*, 672 N.E.2d at 1215.

order, the accusations were made public and the report proved to be substantially true, as is sufficient under Illinois law.

**3.**

The New York Times similarly reported on the Executive Order and the organizations listed in it. The article then turned to groups not yet named but anticipated to be included in future government action. GRF is listed as a group that administration officials "are also recommending" be included on the new list. The article reveals that GRF appeared two years earlier on a Clinton administration list of thirty organizations with suspected ties to terrorism. GRF does not dispute the reference to the Clinton-era list, but instead complains about the "recommending" language, arguing that it is a mere repetition of a government slur against GRF. But again, the report is true. Administration officials were investigating GRF for ties to terrorism and had been doing so since 1997. Government officials did recommend that GRF be included on a future list and it was in fact subsequently included on the list of blocked organizations and SDGTs.

**4.**

The AP report recounted the Executive Order and the organizations included in the first blocking order. The article identified GRF as one of several "U.S.-based relief organizations receiving close federal scrutiny" that "may or may not be on the government's next list." The article also repeated a statement by GRF's lawyer, who remarked that GRF would "have no problem in providing humanitarian assistance to a suicide bomber's family." This is the worst of what the AP had to say about GRF. We need not spend much time analyzing this article because as should already

be clear, this report was literally and absolutely true. GRF was under close federal scrutiny and its inclusion on the list of blocked organization was under contemplation. Although GRF denies that it would aid the families of suicide bombers, it does not dispute that its own lawyer actually said this to the press. That dispute is thus immaterial to the defamation claim.

### 5.

In the Boston Globe article, author Mac Daniel reported that GRF "may be a clandestine agent of terror, according to federal investigators." Daniel noted that GRF appeared on a list of thirty U.S. charities with alleged ties to terrorism two years earlier, following the embassy bombings. The October 11, 2001 article asserted that GRF was expected to be added to the Treasury list of U.S. charities with alleged ties to terrorism in the following week. Daniel noted that GRF would not produce documents showing how its money was spent once it was sent overseas, and that legitimate international relief agencies were unfamiliar with GRF. This article was substantially true. The government suspected GRF of funding terrorist activities, considered blocking the group's assets and later blocked those assets and named GRF a SDGT.

### 6.

The Hearst article focused on Bay Area donors to Muslim charities that were being investigated for financial links to terrorism. The authors described GRF as an organization the Treasury Department was scrutinizing, and repeated GRF's denials of any involvement in terrorism. The report also quoted a security consultant, Rita Katz, who opined that donors to GRF get only part of the truth about the ways the contributions are used. Katz stated that although

some of the money goes to humanitarian activities, some goes to Hamas or al Qaeda. Katz's comments were consistent with the government's actions against GRF and added nothing to the article's true recounting of the government's investigation.

**B.**

Ultimately, all of the reports were either true or substantially true recitations of the government's suspicions about and actions against GRF. "When determining the 'gist' or 'sting' of allegedly defamatory material, a trial court must look at the highlight of the article, the pertinent angle of it, and not to items of secondary importance which are inoffensive details, immaterial to the truth of the defamatory statement." *Parker v. House O'Lite Corp.*, 756 N.E.2d 286, 296 (Ill. App. 1 Dist. 2001) (citing *Gist v. Macon County Sheriff's Dept.*, 671 N.E.2d 1154 (Ill. App. 4 Dist. 1996)) (internal quote marks omitted). Any inaccuracies which do no incremental damage to the plaintiff's reputation do not injure the only interest that the law of defamation protects. *Haynes*, 8 F.3d at 1228; *Gist*, 671 N.E.2d at 1157. We will thus ignore inaccuracies that do no more harm to GRF than do the true statements in the articles. The gist or sting of each article was that the President had issued a blocking order on September 24, 2001 against a number of organizations suspected of providing financial assistance to terrorist groups, and the government was now contemplating adding other charities and non-governmental organizations to the list of blocked entities. Each article named GRF as one of the charities being investigated by the government, and a few noted that GRF had appeared on a list of organizations with suspected ties to terrorism years earlier. Many of the articles included GRF's denials and none of the articles concluded that GRF was actually guilty of the conduct for which it was being investigated. *See Cartwright v. Garrison*,

447 N.E.2d 446, 449-50 (Ill. App. 2 Dist. 1983) (statement that possible legal ramifications resulting from States' Attorney's investigation could include criminal penalties could not reasonably be interpreted as accusing plaintiff of a crime and thus was not actionable). The government in fact added GRF to the list of blocked entities within a few months of these publications, and later classified GRF as a SDGT or Specially Designated Global Terrorist. GRF continues to fight that designation in a separate case but that dispute does not change the fact that the government in fact took these actions as reported. The only inaccuracy in the articles is the timing of the government's official actions against GRF and this inaccuracy does no more harm to GRF than the true statements in the articles. Recall, too, that GRF had already appeared two years earlier on the Clinton-era list of thirty organizations with suspected ties to terrorism. Moreover, for a number of the reports, GRF has no evidence demonstrating the falsity of the report and thus fails to make out an essential element of its claim. For the remainder of the cases, where something in the report was not technically true (such as the timing of the government's accusations and actions), the defendants are entitled to judgment on the defense of substantial truth. *See Sivulich*, 466 N.E.2d at 1220 (article was substantially true even though it contained immaterial error as to the date the complaint was filed). The defense of substantial truth is normally a jury question. *Parker*, 756 N.E.2d at 296; *Cianci*, 698 N.E.2d at 679; *Gist*, 671 N.E.2d at 1157. But first, courts must ask whether a reasonable jury could find substantial truth has not been established. If the answer is no, the question is one of law. *Parker*, 756 N.E.2d at 296; *Cianci*, 698 N.E.2d at 679; *Gist*, 671 N.E.2d at 1157. This is such a case. No reasonable jury could find that substantial truth has not been established. The court was thus correct to enter judgment in favor of the defendants.

## C.

We reject GRF's argument that these media defendants must be able to prove the truth of the government's charges before reporting on the investigation itself. We find unavailing GRF's attempts to distinguish three cases which are directly on point. *See Gist*, 671 N.E.2d 1154; *Sivulich*, 466 N.E.2d 1218; *Vachet v. Central Newspapers, Inc.*, 816 F.2d 313 (7th Cir. 1987). On August 1, 1994, Gist was charged with burglary to a motor vehicle and a warrant was issued for his arrest on that same day. The warrant was not served on Gist, and after he spoke to someone at the sheriff's department on October 26, 1994, a "no-charge" was issued. *Gist*, 671 N.E.2d at 1156. Nonetheless, the sheriff's department subsequently distributed a "most wanted fugitives" flyer that contained Gist's picture, his name, and the charge for which he was wanted, along with similar information for other fugitives. The flyer stated that these fugitives were wanted as of October 6, 1994 and warned that they should be considered armed and dangerous. Gist sued the sheriff's department for defamation, and the department defended the claim by citing the defense of substantial truth. As in the instant case, the court looked to the gist or sting of the allegedly defamatory material. The court found:

> Here, the essence of the matter is that plaintiff was wanted on an arrest warrant as of October 6, 1994, for burglary to a motor vehicle, which is *entirely true*. That plaintiff "might possibly be armed" or "should be considered dangerous" or was a "most wanted" fugitive— to the extent such statements can even be considered as applying to plaintiff or asserting facts about him— are all secondary details, immaterial to the truth of the Crime Stoppers flyer. Viewing the three allegedly defamatory statements under the totality of the circumstances, we conclude that the trial court's decision was also proper in light of the "substantial truth" of the flyer.

*Gist*, 671 N.E.2d at 1157-58 (emphasis in original). The court did not require that the sheriff's department prove the truth of the underlying burglary charge but only the truth of the statement that Gist was wanted for burglary as of October 6, 1994, even though the charges had apparently been dropped by the time the flyer was distributed.

Similarly, in *Sivulich*, a newspaper printed a story about a physical confrontation between Sivulich, a high school football coach, and NeCastro, the grandfather of one of the players. NeCastro filed a civil suit against the coach, and on the next day, the story appeared stating that Sivulich was involved in an altercation with the grandfather of one of the players, that the altercation resulted in the loss of a tooth and more than $500 worth of "personal damages to the 70-year-old man." The article continued:

> Charges of aggravated battery have been filed against Sivulich. Final papers were signed Wednesday, served in court Thursday and are expected to be handed to Sivulich today. Sivulich will have until Nov. 9 to respond to the charges.

*Sivulich*, 466 N.E.2d at 1219-20. Sivulich sued the newspaper, alleging that the statement "charges of aggravated battery have been filed against Sivulich" was libelous *per se*. Sivulich argued that the word "charged" could only be interpreted as a criminal charge when in fact criminal charges were never filed. The court found that, read in the context of the statement about personal damages and a $500 loss, it was clear that the charges were of a civil nature. The court thus found that with the exception of an immaterial error as to the date the complaint was filed, "the article is substantially true." *Sivulich*, 466 N.E.2d at 1220. The civil suit was ultimately settled. Again, the court did not require the newspaper to prove that Sivulich actually was guilty of aggravated battery or that he caused personal damages of $500. It was enough that the newspaper was

substantially truthful in its report that civil charges had been filed against Sivulich.

Finally, in *Vachet*, a newspaper published a story about the arrest of the plaintiff, Michael Vachet, on charges of harboring a fugitive and driving on a suspended license. An elderly woman had been raped and police were searching for their primary suspect, Michael Saucerman. Vachet had called the police to tell them he knew where to find Saucerman. Saucerman had been traveling with Vachet, and after a purported attempt by Vachet to arrange Saucerman's surrender failed, the police decided to charge Vachet with harboring a fugitive. A police lieutenant prepared an affidavit to obtain a warrant for Vachet's arrest but the prosecutor's office failed to complete the paperwork and the warrant had not yet been issued when Vachet was arrested. A local newspaper reported that Vachet was arrested on charges of harboring a fugitive and driving on a suspended license. The article explained that police arrested Vachet on a warrant alleging that Vachet knew the whereabouts of Saucerman, who was wanted on a charge of attempted murder and other charges. The next day, when Saucerman was arrested, the newspaper repeated that Vachet had been arrested and charged with harboring Saucerman. Vachet sued the paper for falsely reporting that he had been arrested and charged with a criminal offense involving moral turpitude. *Vachet*, 816 F.2d at 314-15. He specifically complained that the articles caused him to appear to be associated with the alleged rapist of an elderly woman.

The paper defended by asserting the substantial truth of the articles because Vachet had in fact been arrested for harboring Saucerman, a fugitive. Vachet pointed out that the warrant had never actually issued. Applying Illinois law as we must in this case as well, we found that literal truth was not needed but that the newspaper could successfully defend the suit by showing the truth of the gist or sting of

the story. *Vachet*, 816 F.2d at 316. The gist or sting to which Vachet objected was his association with a suspected rapist of an elderly woman. We found that the gist of the story was true: Vachet had been arrested for harboring a man suspected of raping an elderly woman. We found the particulars of the arrest, whether by warrant or as authorized by state statute, were inoffensive details. *Id.* We did not require the paper to prove that Vachet had in fact harbored Saucerman.

GRF's main response to these cases is that each involved public investigations and proceedings, and that the defendants in the instant case were reporting on secret investigations. But there is no difference between public and private investigations in the applicability of the defense of substantial truth:

> A person does not have a legally protected right to a reputation based on the concealment of the truth. This is implicit in the rule that truth—not just known truth (see *Restatement (Second) of Torts* § 581A, comment h (1977); *Prosser and Keeton on the Law of Torts*, § 116, at pp. 840-41 (5th ed. 1984))—is a complete defense to defamation. And the burden of proving falsity rests on the plaintiff.

*Haynes*, 8 F.3d at 1228. The fact of the investigation was true whether or not it was publicly known. That is all that the defendants need to show for the defense of substantial truth. This they have done.

## D.

GRF also complains that it was prevented from completing discovery into the government's investigation and evidence against GRF. GRF wished to depose the authors of the affidavits on which the defendants rely for their defense of substantial truth. GRF complains that the affidavits do

not establish that GRF actually funneled money to terrorists and that only through depositions could GRF show that the government had no evidence capable of supporting the imputation of guilt. GRF's argument misses the mark again, however, because the sting of the articles was not that GRF was actually funneling money to terrorists but that the government was investigating the group for links to terrorism and contemplating freezing GRF's assets. The sting was that such an investigation was being conducted, not that GRF was guilty of the conduct for which it was being investigated. The particulars of the government's investigation are thus not relevant to this defamation case and the district court was within its discretion to rule without allowing this discovery. GRF does not seriously dispute that the government was in fact conducting the investigation. The resulting blocking order and designation as a SDGT did not materialize out of thin air, after all, but were the result of a government probe. Whether the government was justified in its probe is irrelevant to the defamation claims when these media defendants accurately reported on the investigation itself.

## III.

We have carefully considered all of GRF's other arguments and find no merit in them. The district court was correct to enter summary judgment in favor of the defendants because their reports about GRF were substantially true. GRF was in fact the subject of a federal investigation for links to terrorism and the government ultimately concluded that the group's activities earned it a spot on the list of Specially Designated Global Terrorists. Whether the government was justified in its investigation or correct in its ultimate conclusion is irrelevant to a suit against news media defendants for accurately reporting on the government's probe.

AFFIRMED.

A true Copy:

     Teste:

                    _____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*